# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (NORTHERN DIVISION)

ANNE ARUNDEL COUNTY, MARYLAND
2660 Riva Road – 4th Floor
Annapolis, MD 21401,

        Plaintiff,

        v.

3M COMPANY
3M Center
St., Paul, Minnesota 55144;

EIDP, INC. (formerly known as E.I. DU PONT DE NEMOURS AND CO.)
974 Centre Road
Wilmington, Delaware 19805;

DUPONT DE NEMOURS, INC.
974 Centre Road
Wilmington, Delaware 19805;

THE CHEMOURS CO.
1007 Market Street
Wilmington, Delaware 19899;

THE CHEMOURS CO. FC, LLC
1007 Market Street
Wilmington, Delaware 19899;

CORTEVA, INC.
974 Centre Road
Wilmington, Delaware 19805;

DOW INC.
2211 H.H. Dow Way
Midland, Michigan 48674;

CHEMGUARD, INC.
One Stanton St.
Marinette, Wisconsin 54143

TYCO FIRE PRODUCTS LP

i

One Stanton St.
Marinette, Wisconsin 54143;

KIDDE PLC, INC.
9 Farm Springs Road
Farmington, Connecticut 06032

UTC FIRE & SECURITY AMERICAS CORP., INC.
13995 Pasteur Blvd.                                    CASE NO.: _____
Palm Beach Gardens, Florida 33418;

CARRIER GLOBAL CORP.
13995 Pasteur Boulevard                              JURY TRIAL DEMANDED
Palm Beach Gardens, Florida  33418;

RAYTHEON TECHNOLOGIES CORP. (f/k/a United
Technologies Corp.)
870 Winter Street
Waltham, Massachusetts 02451;

NATIONAL FOAM, INC.
350 East Union Street
West Chester, Pennsylvania 19382;

BUCKEYE FIRE EQUIPMENT CO.
110 Kings Road
Kings Mountain, North Carolina 28086;

ARKEMA, INC.
900 1st Avenue
King of Prussia, Pennsylvania 19406;

BASF CORP.
3000 Continental Drive North
Mt Olive, New Jersey 07828;

CHEMDESIGN PRODUCTS, INC.
2 Stanton St.
Marinette, Wisconsin, 54143-2543;

CLARIANT CORP.
4000 Monroe Road
Charlotte, North Carolina 28205;

CHEMICALS INCORPORATED
12321 Hatcherville Road,

Baytown, Texas 77521;

AGC CHEMICALS AMERICAS, INC.
5 East Uwchlan Avenue, Suite 201
Exton, Pennsylvania 19341;

DEEPWATER CHEMICALS, INC.
196122 E County Road 735
Woodward, Oklahoma 73801;

DYNAX CORP.
103 Fairview Park Drive
Elmsford, New York, 10523;

and

ARCHROMA U.S., INC.
5435 77 Center Dr, #10
Charlotte, NC 28217-0725,

Defendants.
_____

**COMPLAINT**

# TABLE OF CONTENTS

COMPLAINT ........................................................................................................................ iii

table of contents ...................................................................................................................... i

I.     NATURE OF THE ACTION ........................................................................................1

II.    PARTIES .......................................................................................................................6

III.   JURISDICTION AND VENUE ..................................................................................14

IV.    FACTUAL ALLEGATIONS ......................................................................................14

      A.     PFAS ARE DANGEROUS CHEMICALS THAT THREATEN HUMAN AND
ENVIRONMENTAL HEALTH AND SAFETY. ...................................................14

      B.     THE PUBLIC'S UNDERSTANDING OF PFAS, A NATIONWIDE
ENVIRONMENTAL PROBLEM, CONTINUES TO EVOLVE...........................19

      C.     DEFENDANTS' AFFF PRODUCTS HAVE FOR DECADES CONTAMINATED THE
ENVIRONMENT WITH PFAS...........................................................................21

      D.     THE DEFENDANTS KNEW ABOUT BUT CONCEALED THE DANGERS OF PFAS
CONTAINED IN AFFF.......................................................................................25

      E.     DEFENDANTS' AFFF PRODUCTS HAVE CAUSED (AND CONTINUE TO
CAUSE) WIDESPREAD ENVIRONMENTAL CONTAMINATION WITH PFAS IN
ANNE ARUNDEL COUNTY. ...........................................................................35

      F.     HISTORICAL DUPONT'S FRAUDULENT SCHEME TO INSULATE ITS ASSETS
FROM ITS PFAS LIABILITIES ........................................................................40

FIRST CAUSE OF ACTION ...............................................................................................56

SECOND CAUSE OF ACTION ..........................................................................................59

THIRD CAUSE OF ACTION ..............................................................................................61

FOURTH CAUSE OF ACTION ..........................................................................................64

FIFTH CAUSE OF ACTION ...............................................................................................65

SIXTH CAUSE OF ACTION ...............................................................................................66

SEVENTH CAUSE OF ACTION .........................................................................................71

EIGHTH CAUSE OF ACTION ............................................................................................72

NINTH CAUSE OF ACTION ..............................................................................................74

TENTH CAUSE OF ACTION ..............................................................................................79

ELEVENTH CAUSE OF ACTION ......................................................................................80

PRAYER FOR RELIEF .......................................................................................................82

DEMAND FOR JURY TRIAL ............................................................................................83

Plaintiff Anne Arundel County, Maryland ("Plaintiff," the "County," or "Anne Arundel County"), by and through its undersigned counsel, brings this action against defendants 3M Company, EIDP, Inc. (formerly known as E.I. du Pont de Nemours and Co.), DuPont de Nemours, Inc., the Chemours Co., the Chemours Co. FC, LLC, Corteva, Inc., Dow Inc., Chemguard, Inc., Tyco Fire Products LP, Kidde PLC, Inc., UTC Fire & Security Americas Corp., Inc., Carrier Global Corp., Raytheon Technologies Corp. (formerly known as United Technologies Corp.), National Foam, Inc., Buckeye Fire Equipment Co., Arkema, Inc., BASF Corp., ChemDesign Products, Inc., Clariant Corp., Chemicals Incorporated, AGC Chemicals Americas, Inc., Deepwater Chemicals, Inc., Dynax Corp., and Archroma U.S., Inc. (collectively, "Defendants"), and alleges as follows:

## I.    NATURE OF THE ACTION

1.    This case centers on Defendants' conduct in designing, manufacturing, marketing, distributing, supplying, and/or selling aqueous film-forming foam ("AFFF") products, and certain chemical ingredients incorporated into those products, resulting in contamination and pollution of the natural resources located in and around the County with toxic per- and polyfluoroalkyl substances ("PFAS").

2.    The County owns and operates a drinking water treatment and delivery system serving over 120,000 accounts, representing the vast majority of the County's nearly 600,000 residents.  The County's drinking water supplies are sourced exclusively from groundwater wells. The drinking water system includes twelve (12) treatment plants.

3.    The County also owns and operates a wastewater treatment system serving over 130,000 accounts.  The wastewater system includes seven (7) treatment plants.

4.    In addition, the County owns and operates a large stormwater conveyance system

pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit for the benefit of County residents and has responsibility for maintaining the integrity and quality of surface waterbodies within its jurisdiction, including numerous reservoirs, streams, creeks, and lakes, and other public natural resources.

5.     The County and Maryland Department of the Environment ("MDE") have investigated the presence of PFAS contamination in its public resources and properties under its ownership or management, and continue to conduct monitoring and analysis to protect such resources and to preserve the public health.

6.     The County's continuing investigation has demonstrated the presence of elevated concentrations of PFAS chemicals in County resources and properties, including but not limited to perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA").

7.     The County brings this action against Defendants to recover past, current, and future costs, losses, damages, and other relief relating to the actual or potential presence of toxic PFAS traceable to AFFF products in County waters and water systems—including drinking water supplies, drinking water treatment systems, wastewater treatment systems, stormwater systems, and public waters and natural resources under County ownership or management, or for which the County has a responsibility, pursuant to Maryland law, the Charter of Anne Arundel County ("Charter"), and/or the laws, codes, regulations, and enactments of Anne Arundel County ("Local Law"), to protect the integrity or quality of such waters and natural resources—and any lands, facilities, or properties under County ownership or management.  Such costs, losses, and damages include those resulting from or associated with the investigation, assessment, monitoring, analysis, remediation, treatment, removal, disposal, or other past, current, or future action or response, including efforts to protect such public resources from future injury and to compensate for the loss

of use of such resources, relating to the actual or potential presence of PFAS compounds in such resources and properties as a result of Defendants' conduct.

8.    PFOS, PFOA, and other PFAS compounds are all synthetic industrial compounds that are highly toxic to human and animal health, extremely persistent in the environment, soluble in water and fatty tissue, bioaccumulative, volatile or semivolatile, and difficult to remediate or remove from natural resources, water supplies, and other environmental media.

9.    Accordingly, PFAS contamination or pollution of public resources, natural resources, water infrastructure, and other environmental media represents a public health threat that has and will result in significant costs, losses, and damages to the County.

10.    Defendants designed, manufactured, marketed, promoted, distributed, and/or sold, or acquired or assumed the liabilities of persons that designed, manufactured, marketed, promoted, distributed, and/or sold, PFAS compounds, their precursors, and/or products containing PFAS compounds now found in County resources and properties, including AFFF products based on PFAS chemistries.

11.    Defendants did so with knowledge that these dangerous chemicals would be released into the environment during the ordinary and intended use of their AFFF products, foreseeably causing harm to the County.

12.    By the late 1970s, 3M Company ("3M") had confirmed internally that PFOS and PFOA had been detected in human blood, *i.e.*, that the chemicals had spread far beyond the immediate site of their application, and were "more toxic than anticipated." The company, however, withheld information concerning these chemicals' toxicity from the U.S. Environmental Protection Agency ("EPA") and other regulators for decades.    One of 3M's chief scientists

eventually resigned over the company's failure to dedicate sufficient resources to the investigation of PFOS's harms, calling the chemical the "most onerous pollutant since PCB[.]"

13.     DuPont (defined below), which had worked closely with 3M on research concerning PFOS and PFOA since at least the 1970s, likewise recognized many decades ago that PFOA was toxic and needed to be handled with extreme care and likewise withheld this and other information from regulators and the public.

14.     On information and belief, the remaining Defendants also knew or, at a minimum, should have known about the toxicity and environmental hazards posed by the key chemical ingredients in their AFFF and/or AFFF component products, including through their participation in industry trade groups formed for the purpose of lobbying regulators to protect their lucrative AFFF lines of business.

15.     Safer alternatives to AFFF not containing or breaking down into toxic PFAS were available when Defendants designed, manufactured, marketed, distributed, supplied, and/or sold the products that are the subject of this Complaint.  Indeed, under regulatory pressure, several of the Defendants have altered the chemical make-up of their AFFF products to rely on fluorosurfactants that they claim are less biopersistent and less toxic.  Defendants could have made such changes much sooner.

16.     When 3M phased out production of PFOA, Defendant EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company (Historical DuPont) began manufacturing its own PFAS chemicals, despite knowing about the health and environmental risks of PFAS from its use of PFAS for consumer products starting in 1951.  DuPont marketed and sold PFAS to be used in AFFF throughout the United States, including in the County.  In 2015, DuPont transferred its performance chemicals business and some associated liabilities to Defendant The Chemours

Company (Chemours).  Defendants Chemours, Corteva, Inc. (Corteva), Dow Inc. (Dow or New Dow), and DuPont de Nemours, Inc. (New DuPont) are other DuPont affiliates that manufactured PFAS chemicals and/or have succeeded to Historical DuPont's PFAS liabilities.  Historical DuPont, Chemours, Corteva, Dow, and New DuPont are collectively referred to in this Complaint as "DuPont."

17.     Defendants also failed to provide adequate warnings and instructions with their AFFF products.  Indeed, Defendants failed to advise adequately about (i) the harms their PFAS-based AFFF products posed to the environment and human health; (ii) methods of environmentally safe disposal of their AFFF products; and (iii) designs of AFFF release sites, including firefighting training sites, that would limit or potentially eliminate the release of PFAS into the environment or otherwise mitigate their environmental effects.

18.     On information and belief, Defendants' AFFF products and/or PFAS-based products used in the production of AFFF products have been used, stored, handled, released, and disposed of in the County and/or in the vicinity of the County's resources, including its drinking water supplies, drinking water treatment system, wastewater treatment system, stormwater conveyance system, surface waterbodies, and other natural and public resources.

19.     As a result, Defendants caused contamination of the County's natural resources and properties.  The County's natural resources and properties have been and continue to be contaminated by Defendants' AFFF products and additional County natural resources and properties are under threat of future injury due to known PFAS contamination upstream and/or upgradient from such resources and properties.

20.     At all times relevant to this action, the County neither knew nor should have known of the actual or potential contamination of its resources and properties with dangerous PFAS

compounds resulting from the ordinary and intended use and disposal of Defendants' AFFF products.

21.    The County seeks to recover all damages available by law, including compensatory, consequential, and punitive damages; restitution; injunctive relief requiring Defendants to abate injured or impaired County resources and properties; and all other relief available under law.

22.    This action addresses only PFAS-related injuries attributable to the Defendants as a result of the design, manufacture, marketing, distribution, sale, use, and/or disposal of AFFF products and AFFF component products.  To the extent the County has suffered or may in the future suffer injuries relating to PFAS associated with a different application or other use of PFAS compounds, such claims are not included in this action, may be pursued in a separate action, and are expressly preserved.

## II.    PARTIES

23.    Anne Arundel County, Maryland is a body corporate and politic, duly organized and existing by virtue of the Home Rule Amendment to the Maryland Constitution and the laws of the State of Maryland.

24.    The Express Powers Act explicitly enumerates the powers held by home rule counties such as Anne Arundel County, including the power to abate nuisances and to protect the public health.  Md. Code Ann. Local Gov't. § 10-328.  Home-rule counties are granted the power to enact laws to "aid in maintaining the peace, good government, health and welfare of the county" (Md. Code Ann. Local Gov't § 10-206) and Maryland courts have long interpreted this grant of legislative power to include broad police powers necessary and proper to protect in good faith the health and welfare of the community.  Anne Arundel County in turn exercises this legal and

regulatory authority to safeguard the public health and the public and natural resources of its community through, for example, the Anne Arundel County Code and other Local Law.

25.     Pursuant to the Charter, the County has "all rights and powers of local self-government and home rule as are now or may hereafter be provided or necessarily implied by this Charter and by the Constitution and laws of the State of Maryland."  Sec. 101.

26.     The County Department of Public Works ("DPW") is responsible for drinking water, wastewater, and stormwater management as well as watershed protection and restoration.

27.     The County's drinking water supplies are drawn from deep aquifers, including the Patapsco, Patuxent, and Aquia aquifers.  The County's 12 drinking water treatment facilities provide roughly 12 billion gallons of drinking water to the public each year.

28.     The County's drinking water delivery system is comprised of a network of over 1,400 miles of water mains as well as fire hydrants, valves, elevated storage tanks, and other infrastructure that facilitate distribution to residences and businesses throughout the County.

29.     The County's wastewater system includes seven treatment facilities and over 260 pump stations, as well as over 1,300 miles of gravity sewer lines, 41,000 sewer manholes, and 160 miles of force mains.

30.     The County's stormwater system is comprised of nearly 40,000 storm drain inlets, more than 1,000 miles of pipe, and more than 6,500 outfalls.  The County maintains several water quality monitoring sites at which chemical, physical, and biological monitoring of watershed restoration efforts and stormwater management application is conducted.

31.     To discharge stormwater from its municipal separate storm sewer system ("MS4"), the County is subject to a large Municipal Separate Storm Sewer Permit issued by the State of

Maryland, Department of the Environment, pursuant to the National Pollutant Discharge Elimination System (NPDES, as defined above) under the Clean Water Act.

32.    The County's MS4 system discharges into surface waters such as the Little Patuxent River, Patapsco River, Lower Patuxent River, Magothy River, Middle Patuxent River, Severn River, South River, Upper Patuxent River, West Chesapeake Bay, and West River. Several of the receiving water bodies are critical tributaries to the Chesapeake Bay. Among other legal obligations imposed by the NPDES permit, the County is responsible for reducing, to the maximum extent practicable, discharge of pollutants through its stormwater system.

33.    In light of federal and state action regarding PFAS regulation and control, the County anticipates being required in the future to retrofit or upgrade its water infrastructure, including drinking water, wastewater, and stormwater systems, in order to manage, remove, control, and reduce the presence of PFAS in its resources and properties and in resources and properties of other jurisdictions.

34.    The County will also continue monitoring, assessing, investigating, and otherwise responding to PFAS contamination issues in its water infrastructure and resources, to protect public health. The County further anticipates that remediation and removal activities targeting PFAS contamination in its water infrastructure and resources will be required under federal and/or state law.

35.    The County brings this action in its governmental capacity, including as *parens patriae* on behalf of its residents to protect a quasi-sovereign interest in the health and well-being of a substantial segment of its population and the integrity and unimpaired quality of its natural resources and public resources, pursuant to its legislative, legal, and police powers, including as set forth in the Charter and under Maryland law and Local Law, and pursuant to its legislative

responsibility for the maintenance and operation of drinking water, wastewater, stormwater and other water systems.

36.    Defendant 3M Company (3M as defined above) is a Delaware corporation with its principal place of business in St. Paul, Minnesota.  3M designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS, including PFOS, PFOA, and PFHxS.  Upon information and belief, these 3M products were used and discharged into the environment in and around the County.

37.    Defendant EIDP, Inc., formerly known as E.I. du Pont de Nemours and Co. and referred to here as Historical DuPont, is a Delaware corporation with its headquarters and principal place of business in Wilmington, Delaware.

38.    Defendant The Chemours Company is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899.  The Chemours Company was incorporated as a subsidiary of Historical DuPont as of April 30, 2015.  From that time until July 2015, The Chemours Company was a wholly owned subsidiary of Historical DuPont.  In July 2015, Historical DuPont spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its PFAS business, along with vast environmental liabilities.  Historical DuPont distributed shares of The Chemours Company stock to Historical DuPont stockholders, and The Chemours Company has since been a separate, publicly traded company.

39.    Defendant The Chemours Company FC, LLC is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.  The Chemours Company FC, LLC operates as a subsidiary of The Chemours Company and manufactures fluoropolymer resins.

9

40.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

41.     Following the Chemours Spin-off, Historical DuPont merged with The Dow Chemical Company (Old Dow) in August 2017 to create DowDuPont Inc. (DowDuPont). Historical DuPont and Old Dow each merged with wholly owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont.  Since that time, DowDuPont has effected a series of separation transactions to split its businesses into three independent, publicly traded companies. These three companies are the remaining Defendants in this action: Dow Inc. (Dow or New Dow), Corteva, Inc. (Corteva), and DuPont de Nemours, Inc. (New DuPont).

42.     Defendant Dow Inc. is a corporation formed and existing under the laws of the State of Delaware with its principal place of business at 2211 H.H. Dow Way, Midland, Michigan 48674.  New Dow was spun out of DowDuPont and became an independent, publicly traded company on April 1, 2019.  It operates a materials science business.

43.     Defendant Corteva, Inc is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.  Corteva was initially formed in February 2018 to serve as the holding company for the agriculture business.  On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro rata dividend, which converted Corteva into a separate, publicly traded company.  Following that distribution, Corteva is the direct parent of Historical DuPont (*i.e.*, EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company) and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

44.     Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc., is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington,

10

Delaware 19805.  On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and New Dow, changed its name to DuPont de Nemours, Inc.  New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of Historical DuPont not assumed by Corteva.

45.     Throughout this Complaint, New DuPont, Historical DuPont, Chemours, Dow, and Corteva are referred to collectively as "DuPont."  On information and belief, fluorosurfactants manufactured by DuPont were used to manufacture AFFF that was used and discharged into the environment in and around the County.

46.     Defendant Buckeye Fire Equipment Co. ("Buckeye") is an Ohio corporation with its principal place of business in Mountain, North Carolina.  Buckeye designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these AFFF products were used and released into the environment in and around the County.

47.     Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business in Marinette, Wisconsin.  Chemguard designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these Chemguard products were used and discharged into the environment in and around the County

48.     Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business in Angier, North Carolina.  National Foam is a subsidiary of Angus International Safety Group, Ltd.  National Foam designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these AFFF products were used and released into the environment in and around the County.

49.     Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business in Lansdale, Pennsylvania.  Tyco is the parent corporation to Chemguard and successor-in-interest to the Ansul Company ("Ansul").  Tyco designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these Tyco products were used and discharged into the environment in and around the County

50.     Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business in Farmington, Connecticut.

51.     Defendant UTC Fire & Security Americas Corp., Inc. ("UTC") is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida.  UTC is a successor-in-interest to United Technologies Corp.

52.     Defendant Carrier Global Corp. ("Carrier") is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida.

53.     Defendant Raytheon Technologies Corp. ("Raytheon") is a Delaware corporation with its principal place of business in Farmington, Connecticut.  Raytheon was formerly known as United Technologies Corp.

54.     Defendants Kidde PLC, Inc., UTC, Carrier, and Raytheon are referred to herein as the "UTC Defendants."  The UTC Defendants designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these AFFF products were used and released into the environment in and around the County.

55.     Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation with its principal place of business in Exton, Pennsylvania.  Upon information and belief, AGC's fluorosurfactants were used to manufacture AFFF that was used and discharged into the

12

environment in and around the County.

56.    Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Upon information and belief, Archroma's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around the County.

57.    Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business in King of Prussia, Pennsylvania.  On information and belief, Arkema was formerly known as Atochem, Inc. and/or is the successor-in-interest to Atochem, Inc.  On information and belief, fluorosurfactants manufactured by Arkema and/or Atochem, Inc. were used to manufacture AFFF that was used and discharged into the environment in and around the County.

58.    Defendant BASF Corp. ("BASF") is a Delaware corporation with its principal place of business in Florham Park, New Jersey.  BASF is a successor-in-interest to Ciba-Geigy Corp. Upon information and belief, fluorosurfactants manufactured by BASF and/or Ciba-Geigy Corporation or Ciba Specialty Chemicals, including those trademarked Lodyne™, were used to manufacture AFFF that was used and discharged into the environment in and around the County.

59.    Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business in Marinette, Wisconsin.  Upon information and belief, fluorosurfactants manufactured by ChemDesign were used to manufacture AFFF that was used and discharged into the environment in and around the County.

60.    Defendant Chemicals Incorporation ("Chem Inc.") is a Texas corporation with its principal place of business in Baytown, Texas.  Upon information and belief, fluorosurfactants manufactured by Chem Inc. were used to manufacture AFFF that was used and discharged into

the environment in and around the County.

61.     Defendant Clariant Corp. ("Clariant") is a New York corporation with its principal place of business in Charlotte, North Carolina.  Upon information and belief, Clariant's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around the County.

62.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business in Woodward, Oklahoma.  Upon information and belief, fluorosurfactants manufactured by Deepwater were used to manufacture AFFF that was used and discharged into the environment in and around the County.

63.     Defendant Dynax Corp. ("Dynax") is a Delaware corporation with its principal place of business in Elmsford, New York.  Upon information and belief, Dynax's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around the County.

## III.    JURISDICTION AND VENUE

64.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants, and the amount in controversy exceeds the minimal jurisdictional limits of this Court.  The Plaintiff is located in Maryland, but no Defendant is a citizen of Maryland.

65.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) because all of the natural resources and/or property that is the subject of the action are situated in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    PFAS ARE DANGEROUS CHEMICALS THAT THREATEN HUMAN AND ENVIRONMENTAL HEALTH AND SAFETY.

66.    Per- and polyfluoroalkyl substances (PFAS, as defined above) are a group of synthetic chemical compounds containing fluorine and carbon atoms. They are known as "surfactants" in that they reduce the surface tension of water. As such, these chemicals have been used for decades in the manufacture of household and commercial products that resist heat, stains, oil, and water, including carpet and clothing treatments, cardboard packaging and leather products, emulsifiers, wetting agents, additives and coatings, processing aids in the manufacture of fluoropolymers such as nonstick coatings on cookware, and membranes for clothing that are both waterproof and breathable.

67.    PFAS are man-made; they do not occur naturally.

68.    The two most widely studied types of PFAS are PFOA and PFOS, both synthetic, fully fluorinated organic acids with eight carbon atoms.

69.    Although PFOS and PFOA are the most widely studied types of PFAS, the PFAS family includes thousands of different chemicals. Defendants have incorporated dozens of different PFAS chemicals in their AFFF product formulations, including PFOA, PFOS, and PFHxS, among others.

70.    PFAS compounds have a number of unique properties that, together, turn these chemicals into a grave threat to public health and the environment.

71.    ***PFAS chemicals are mobile and persistent***. They readily spread into the natural environment upon release, where they break down very slowly, if at all.

72.    The compounds are characterized by multiple carbon-fluorine bonds, which are exceptionally strong and stable. As such, they are extremely persistent in the environment and resistant to metabolic and environmental degradation.

73.    PFAS compounds easily dissolve in water and are thus highly mobile and readily spread in the environment.  They contaminate soils and leach from the soil into groundwater, where they can travel significant distances underground.

74.    PFAS compounds are also volatile or semivolatile.  Small amounts of the chemicals are routinely and uncontrollably released in the vapor phase from PFAS-containing products and PFAS-contaminated sites and waterbodies, and travel with air currents in vapor form.  When such vapors re-suspend or condense, the chemicals are deposited in new locations and environmental media, including surface waters, soils, and others.

75.    Through both water and air, therefore, PFAS contamination is aggressively mobile and difficult to control.

76.    ***PFAS chemicals bioaccumulate and biomagnify*** in the environment. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than that at which the substance is lost by catabolism and excretion.  Biomagnification is the increasing concentration of a substance in the tissues of tolerant organisms at successively higher levels in a food chain.

77.    PFAS chemicals are extremely stable and persistent and as such, once ingested, tend to bioaccumulate in individual organisms for a significant period of time.

78.    For example, PFOS, PFOA, and PFHxS, among other PFAS, have been shown to accumulate to levels of concern in fish, reaching concentrations of several thousands of times higher than in water.  The compounds have been detected in both wild-caught and farmed fish, presumably as a result of bioaccumulation and/or trophic transfer, i.e., biomagnification up the food chain.

79.    PFOA, PFOS, and PFHxS, among other PFAS, have also been shown to bioaccumulate in air-breathing species, including humans.

16

80.    PFAS chemicals further bioaccumulate in the unborn and in infants by crossing the placenta from mother to fetus and by passing to infants through breast milk.

81.    PFAS chemicals biomagnify up the food chain—for example, when humans eat fish that have ingested the substances.  PFOS has been observed in high concentrations in various animals higher up in the food chain, including bald eagles, walrus, narwhals, and beluga whales.

82.    Finally and critically, ***PFAS chemicals are toxic***. Numerous studies make plain that exposure to or ingestion of these chemicals can pose serious risks to humans and to animals.

83.    All PFAS exhibit one or more of the "key characteristics of carcinogenicity." According to a March 2020 peer-reviewed study examining the properties of 26 PFAS compounds, including PFOA, PFOS, and PFHxS, all compounds studied demonstrated one or more of the key characteristics of carcinogens, such as inducing oxidative stress, immunosuppression, inducing epigenetic alterations, influencing cell proliferation, and modulating receptor-mediated effects.

84.    Human epidemiological studies, relied upon by the EPA for purposes of the agency's health advisories on PFOA, have found associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and testicular and kidney cancer.

85.    Recent research conducted by the National Toxicology Program ("NTP"), a division of the National Institute for Environmental Health Sciences ("NIEHS"), has also linked exposure to extremely small amounts of PFOA to pancreatic cancer.

86.    Human epidemiological studies, relied upon by the EPA for purposes of the agency's health advisories on PFOS, found associations between PFOS exposure and high cholesterol, thyroid disease, and adverse reproductive and developmental effects, including

17

gestational diabetes, preeclampsia, and low birth weight. The developing fetus and newborns are particularly sensitive to PFOS-induced toxicity.

87.    PFOS and PFOA are toxic to laboratory animals, producing reproductive, developmental and systemic effects in laboratory tests.

88.    The World Health Organization's International Agency for Research on Cancer has found that PFOA is possibly carcinogenic to humans.

89.    The EPA has found that there is suggestive evidence that PFOS and PFOA may cause cancer in humans.

90.    A March 2020 peer-reviewed study applied ten key characteristics of carcinogens to 26 PFAS compounds, including PFOA, PFOS, and PFHxS. The "key characteristics of carcinogens" framework is used for cancer hazard identification.

91.    That study found "strong evidence" that multiple PFAS induce oxidative stress, are immunosuppressive, and modulate receptor-mediated effects. The study found "suggestive evidence" that some PFAS can induce epigenetic alterations and influence cell proliferation.

92.    In particular, the study identified evidence that: (a) PFOA induces epigenetic alterations; induces oxidative stress; induces chronic inflammation; is immunosuppressive; modulates receptor-mediated effects; and alters cell proliferation; (b) PFOS induces epigenetic alterations; induces oxidative stress; induces chronic inflammation; is immunosuppressive; modulates receptor-mediated effects; and alters cell proliferation; and (c) PFHxS induces oxidative stress; is immunosuppressive; modulates receptor-mediated effects; and alters cell proliferation.

93.    Similar traits associated with carcinogenicity were identified with respect to other PFAS compounds utilized in AFFF products designed, manufactured, marketed, distributed, provided, supplied and sold by Defendants.

94.     Another peer-reviewed study published in 2020 found further evidence that certain PFAS compounds, particularly PFOS and PFOA, result in premature births, decreased fertility, and increased odds of low birth weight.  These adverse effects on reproductive health were demonstrated by an analysis of birth outcomes in Oakdale, Minnesota, where a portion of the population faced elevated exposure to PFAS due to long-term contamination of drinking water supplies from industrial waste disposal.  The study focused on birth outcomes in the area from 2002 to 2011.  Reproductive outcomes improved significantly following the installation of a water filtration facility in Oakdale at the end of 2006, demonstrating the causal relationship between exposure to high level of PFAS in drinking water and reproductive health.

95.     In October 2021, EPA also released a final human health toxicity assessment for GenX chemicals, which incorporated new data available since 2018. The EPA's assessment resulted in a lower, more protective toxicity value for GenX chemicals relative to EPA's 2018 draft toxicity assessment.

96.     On November 16, 2021, EPA further provided the Science Advisory Board PFAS Review Panel with recent scientific data and new analyses that indicate negative health effects may occur at much lower levels of exposure to PFOA and PFOS than had previously been understood, and that PFOA is a likely carcinogen.

97.     In addition, ongoing research indicates that PFAS compounds negatively affect growth, learning, and behavior of infants and older children, decrease women's ability to become pregnant, and interfere with the body's natural hormones.

**B.     THE PUBLIC'S UNDERSTANDING OF PFAS, A NATIONWIDE ENVIRONMENTAL PROBLEM, CONTINUES TO EVOLVE.**

98.     Given their physical and chemical properties, PFAS chemicals have become incredibly widespread in the environment, contaminating drinking water supplies, water

infrastructure (including stormwater systems, water treatment plants, and drinking water delivery infrastructure), and posing an environmental and human health crisis in Anne Arundel County and beyond.

99.    Indeed, PFAS have been detected in environmental media and biota in many parts of the world, including oceans and the Arctic.

100.    The chemicals have been found in cereals, fish, soft drinks, milk, olive oil, and meat, as well as in prepared foods.

101.    According to the EPA, between 1999 and 2012, PFOA and PFOS have been detected in the blood serum of 99% of the U.S. population.  This is particularly troubling given the real and significant adverse health effects these chemicals pose.

102.    The Director of the U.S. Center for Disease Control's National Center for Environmental Health, Patrick Breysse, described the chemicals in October of 2017 as "one of the most seminal public health challenges for the next decades" and estimated 10 million Americans were drinking contaminated water.  Current research estimates that this number is significantly higher—likely in the hundreds of millions of Americans.

103.    This understanding of PFAS contamination as a widespread public health crisis has been slow to evolve, however, and has only fairly recently garnered broad attention.  Indeed, although the EPA began to investigate the safety of PFOA and PFOS in or around 1998 following some limited disclosures by 3M and others, the agency did not begin to issue health advisories for these chemicals until January 8, 2009.

104.    The 2009 EPA health advisory noted merely that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively.

105.    In May 2016, the EPA significantly revised its PFOA and PFOS health advisory, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt.

106.    Notably, the EPA's health advisories are only "informal technical guidance to assist federal, state and local officials, as well as managers of public or community water systems in protecting public health. They are not regulations and should not be construed as legally enforceable federal standards."

107.    In February 2020, EPA announced its intention to regulate PFOA and PFOS as "hazardous substances" under federal environmental laws, such as CERCLA.

108.    In November 2020, EPA announced its intention to address PFAS in NPDES permits. On September 8, 2021, the agency announced that it was initiating three new rulemakings to reduce PFAS contamination by way of wastewater discharges from several key industries.

109.    Following completion of peer review of several human health studies on PFOA, PFOS, and other PFAS chemicals, in June 2022, EPA announced new, significantly reduced interim Health Advisory Levels for PFOA and PFOS of, respectively, 0.004 ppt (or 4 parts per quadrillion) and 0.02 ppt (or 20 parts per quadrillion).

110.    In March 2023, EPA proposed a new National Primary Drinking Water Regulation to establish legally enforceable Maximum Contaminant Levels for PFOA and PFOS of 4 ppt each.

C.    **DEFENDANTS' AFFF PRODUCTS HAVE FOR DECADES CONTAMINATED THE ENVIRONMENT WITH PFAS.**

111.    The PFAS application critical to the claims asserted in this Complaint is AFFF, which is widely used to suppress and extinguish fires of flammable liquids, such as fuel and oil.

112.    In the 1940s, 3M began to experiment with a process called electrochemical fluorination to create the carbon-fluorine bonds that are they key components of PFAS, including PFOA, PFOS, and PFHxS.

113.    The other major carbon-fluorine bond producing process, which was used by the remaining Defendants, is called telomerization.  This process generally results in PFOA and other carboxylates.

114.    Beginning in the 1950s through 2000, 3M sold PFOA to DuPont for use in DuPont's manufacturing operations.  After 3M ceased production beginning in or around 2000, DuPont began producing PFOA.

115.    Recognizing the compounds' strong surfactant properties described above and building on its earlier experiments, 3M began to develop AFFF containing PFOS in the early 1960s to suppress flammable liquid fires that cannot be effectively extinguished with water alone.

116.    In the late 1960s, the United States military issued military specification MIL-F-24385 governing the requirements for AFFF ("AFFF Mil Spec").  It required that the AFFF concentrate "consist of fluorocarbon surfactants plus other compounds . . ."  The AFFF Mil Spec, however, contains no further requirements concerning these fluorocarbons surfactants, such as the length of the fluorine-carbon chain.  The AFFF Mil Spec also states that "[t]he material shall have no adverse effect on the health of personnel when used for its intended purpose."

117.    The United States government has expressly clarified that the AFFF Mil Spec "was a *performance* military specification (as opposed to a *detail* military specification); meaning that the product manufacturers [and not the United States government] determine[d] the exact formulation and specific perfluorocarbon surfactants . . ."

118.    From the 1960s to about 1973, 3M was the sole supplier of AFFFs.  Beginning in 1973, fluorotelomer-based AFFF manufacturers entered the market.

119.    AFFF is applied by firefighters in the field by mixing foam concentrate and water to make a foam solution. When applied to a fire, the foam solution is aerated at the nozzle.  The foam solution is sprayed out to coat the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier.  A film also forms to smother the fire after the foam has dissipated:



120.    In other words, it is intended by, and foreseeable to, the AFFF manufacturer or supplier that AFFF will be mixed with water and sprayed in such a manner that it can freely seep into the groundwater and soil, contaminating the environment.

121.    PFAS-based AFFF is the predominant commercial PFAS application that, when used as intended, releases these toxic chemicals directly into the environment in a manner enabling them to freely seep into the groundwater, contaminate drinking water supplies, and travel long distances to cause further, widespread environmental contamination.

23

122.    A single firefighting event or training exercise may result in the release of thousands of gallons of foam solution laced with PFAS that then enter and contaminate the environment.

123.    For decades, PFAS-based AFFF products have been stored and used for fire suppression, fire training, and flammable vapor suppression at hundreds of locations, such as fire training schools, military installations, and civilian airports, as well as at petroleum refineries, storage facilities, and chemical manufacturing plants throughout the United States, including in Anne Arundel County.

124.    Additionally, local fire departments have used and maintained quantities of AFFF in their inventories.

125.    Fire training exercises involving AFFF are common, particularly on airfields, fire training schools, and military installations, and have been performed many thousands of times since the 1960s, each time releasing vast quantities of toxic chemicals into the environment.

126.    AFFF use has been identified as one of the main contributors to the widespread environmental contamination with PFAS.

127.    Despite the recent phase-out of certain long-chain PFAS, further discussed below, much of the current AFFF stockpiles still contain long-chain PFAS constituents due to the long shelf-life of these products.  PFAS-based AFFF thus continues to be widely stored and used, including in or around Anne Arundel County.

128.    Significantly, in recognition of the dangers of PFAS, the AFFF Mil Spec was amended in September 2017 to state expressly that the Department of Defense seeks "to acquire and use a non-fluorinated AFFF formulation or equivalent firefighting agent to meet [its] performance requirements …." and again in April 2020 to make clear that the AFFF Mil Spec

requires only that AFFF "[c]oncentrates shall consist of surfactants plus other compounds…" – not necessarily fluorosurfactants.

129.   Had Defendants been forthright about their products' chemical properties and the environmental and human health hazards they posed, the Department of Defense (and federal and state regulatory agencies) would have taken steps to prevent, control, or minimize the environmental and human health threats from AFFF containing and/or breaking down into PFAS, including PFOA, PFOS, and PFHxS, much sooner, or would never have used them in the first place.

### D.   THE DEFENDANTS KNEW ABOUT BUT CONCEALED THE DANGERS OF PFAS CONTAINED IN AFFF.

130.   Particularly 3M and DuPont have known or, at a minimum, should have known for many decades that PFOA, PFOS, and other PFAS compounds are mobile and persistent, bioaccumulative and biomagnifying, volatile, and above all toxic.

131.   Upon information and belief, the other Defendants, each of which designed, manufactured, marketed, provided, supplied, sold, and/or distributed PFAS-based AFFF and/or AFFF component products, likewise knew of the dangers posed by PFAS, including through information they obtained as part of their participation in trade industry associations.

132.   All Defendants were careful to withhold the most damning information about PFOS, PFOA, and other PFAS from the public and regulators.

133.   3M conducted extensive toxicity studies on PFAS, including PFOS and PFOA, as early as the 1950s, concluding that the chemicals were toxic.

134.   Further toxicity studies conducted by 3M scientists in the late 1970s confirmed that the chemicals were even "more toxic than anticipated."

135.    In 1978, 3M conducted studies on monkeys and rats, feeding them various dosages of PFOS and PFOA.  All monkeys in the study died within the first few days after being given PFOS at a dosage of 4.5 mg/kg/day.  Monkeys being given 100 mg/kg/day of PFOA "all died during weeks 2 and 5 of the study."  The companies' studies showed that both PFOA and PFOS affected the liver and gastrointestinal tract of the species tested.

136.    3M concluded that PFOS was "the most toxic" of the compounds studied and "certainly more toxic than anticipated."

137.    3M consulted with Harold Hodge, a well-known toxicologist, who emphasized that it was of "utmost importance" to determine whether these chemicals "or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

138.    Further, in 1975, 3M was alerted by third-party researchers that PFOS was detectable in human blood serum and thus had obviously spread beyond the immediate site of its applications and was bioaccumulating.  3M's own research confirmed by the next year that the level of fluorochemicals in the blood of its own workers was "1,000 times normal."

139.    Conducting research around its manufacturing plants, 3M knew by 1979 that its fluorochemicals "bioaccumulated more readily in the gastrointestinal tract, fat and reproductive system [at least in] channel catfish[.]"

140.    By 1979, 3M recognized that fluorochemicals may pose a cancer risk.  Indeed, one of its scientists pressed that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."

141.    3M never published its toxicity studies and worked actively to stifle research on the adverse effects of PFAS, including PFOA and PFOS.  Indeed, 3M kept John Giesy, Ph.D.,

26

Professor and Canada Research Chair in Environmental Toxicology in the Department of Veterinary Biomedical Sciences and Toxicology Centre at the University of Saskatchewan, on its payroll to the tune of millions of dollars for the purpose of influencing independent academic research.  It was Prof. Giesy's professed goal to keep unfavorable papers regarding PFAS out of the academic literature, lest plaintiffs find scientific support for legal theories seeking to hold 3M liable for injuries.

142.    3M also advised its employees not to put their thoughts and research concerning PFOS or PFOA to writing, as such communications would need to be disclosed during discovery in likely litigation.

143.    3M also knew full well the environmental implications associated with PFAS compounds, including PFOS and PFOA, but refused to allow testing to perform precise ecological risk assessments.  One of its longtime scientists, Dr. Richard Purdy, stated in an internal email: "PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates that it is probably worse.  I am outrage[d.]"

144.    Despite 3M's knowledge of PFAS toxicity and potential carcinogenicity, the mobility and persistence in the environment of such chemicals, and their tendency to bioaccumulate and biomagnify, the company continued to manufacture, sell, and distribute PFAS-based AFFF until at least 2000.

145.    Dr. Purdy resigned, exhausted by the company's "roadblocks, delays, and indecision" concerning research on PFAS' environmental effects and failure to address their known environmental harms:

- 3M continues to make and sell these chemicals, though the company knows of an ecological risk assessment I did that indicates there is a better than 100% probability that perfluorooctansulfonate is biomagnifying in the food chain and harming sea mammals. This chemical is more stable than many rocks. And the chemicals the company is considering for replacement are just as stable and biologically available. The risk assessment I performed was simple, and not worst case. If worst case is used, the probability of harm exceeds 100,000%.

Dr. Purdy concluded that he could no longer work for a company "concerned with markets, legal defensibility and image over environmental safety."

146.    Dr. Purdy copied the EPA on his March 1999 resignation letter.

147.    Shortly thereafter, 3M supplemented its prior submissions to the EPA with critical information referenced by Dr. Purdy. In 2000, 3M "voluntarily" ceased production of certain PFAS compounds, including PFOS and PFOA.

148.    In April 2006, 3M paid a penalty of more than $1.5 million to the EPA for its failure to disclose pertinent studies regarding PFOA and PFOS.

149.    Much like 3M, DuPont has been aware of the toxicity of PFAS, including PFOA, for decades.

150.    By 1961, DuPont's own researchers had concluded that PFOA was toxic and should be "handled with extreme care." During the 1960s, DuPont also had knowledge that PFOA caused adverse liver reactions in dogs and rats.

151.    By 1976, DuPont was also aware of research reports that detected organic fluorine in blood bank samples in the U.S., which the researchers believed to be a potential result of human exposure to PFOA. In other words, DuPont knew or should have known that PFOA was traveling in the environment and bioaccumulating in other organisms.

152.    By 1982, DuPont's corporate medical director, Bruce Karrh, in internal correspondence confirmed that PFOA stays in the blood for a long time and registered his concern

that members of the local community may be affected by PFOA releases. DuPont then began a clandestine water sampling program to determine how far a distance from its operations PFOA remained in the waterways at elevated levels. DuPont detected PFOA in water supplies at a distance of at least 79 miles from its Parkersburg plant.

153.    In 1979, DuPont further became aware of the PFOA/PFOS toxicity studies 3M had conducted on monkeys and rats described above.

154.    About three years later, 3M also shared a study undertaken on pregnant rats, indicating that PFOA led to adverse effects in the unborn. DuPont tested the blood of female workers who had given birth and had been exposed to PFOA, documenting that PFOA moved across the human placenta.

155.    DuPont transferred all women out of work assignments with potential exposure to PFOA, but concealed its pregnancy-related study from the EPA and public.

156.    During the mid-1980s, DuPont continued to find evidence of toxicity of PFOA. In 1985 and 1986, researchers from DuPont's Haskell Laboratory for Toxicology and Industrial Medicine published two studies on the toxicity of PFOA. One study found PFOA to be "moderately toxic," producing "an increase in liver size and corneal capacity" in rats exposed by inhalation to PFOA; the other studied dermal toxicity in rats and rabbits and found skin irritation in both, and increased liver size in rats.

157.    By 1988, DuPont was aware that at least one toxicity study performed on laboratory rats revealed a relationship between PFOA exposure and increased rates of certain types of cancer, including testicular cancer.

158.    In 1988, DuPont internally classified PFOA as a possible human carcinogen.

159.    Evidence of PFOA's toxic effects continued to mount.  In 1999, DuPont received data from a laboratory study on the effects of PFOA exposure on primates that showed that two of twenty-two monkeys had died, including one that had received the lowest dose of PFOA.  And, by June 2000, DuPont was aware that the American Council of Governmental and Industrial Hygienists had designated PFOA as a "confirmed animal carcinogen."

160.    Despite its knowledge of PFOA's toxicity and carcinogenicity, its mobility and persistence in the environment, and its tendency to bioaccumulate, however, DuPont continued to use PFOA in its products (and, beginning in 2002, also manufactured the chemical once its primary source, 3M, had exited that market), including surfactants made for use in the manufacture of AFFF.

161.    Having doubled down on the PFAS business, DuPont continued to actively conceal the risks of PFOA and other PFAS from the public.  Beginning in 2003, DuPont paid various consultants, including The Weinberg Group, thousands of dollars to implement a comprehensive strategy to attack and discredit those who alleged adverse health effects from PFOA, to prevent third parties from connecting DuPont to PFOA health problems, to coordinate media and third-party communications, and to thwart any PFOA-related litigation.

162.    In February 2003, a manager at DuPont's Parkersburg plant made knowingly false and misleading statements to the media, that: "[i]n more than 50 years of [PFOA] use by [DuPont] and others, there have been no known adverse human health effects associated with the chemical," that "all" of the available scientific research "has been provided to both state and federal regulators," that "epidemiological studies of workers do not indicate an increased risk of cancer associated with exposure to [PFOA]," that "[DuPont] has made significant efforts to respond to the public honestly and openly with correct information about [PFOA]," and that "the use of

[PFOA] at the Washington Works site has not posed a risk to either human health or the environment."

163.    Later, in March and April of 2003, various DuPont employees and executives — including its Vice President and General Manager of Fluoroproducts, the Director of its Haskell Laboratory, its spokesperson for the Plant, and its CEO — made public statements denying that DuPont had seen any negative impacts on human health or the environment caused by DuPont's use of PFOA.

164.    DuPont made multiple, additional knowingly false and misleading public statements regarding the toxicity and adverse health effects of PFOA and other PFAS.

165.    DuPont settled the Parkersburg resident litigation in 2005, as part of which settlement DuPont would financially support what was dubbed the "C8 Science Panel," made up of three independent epidemiologists from Emory University, Brown University, and the London School of Hygiene and Tropical Medicine, and tasked with researching the health effects of PFOA based on blood samples and other health data taken from almost 70,000 residents of the mid-Ohio Valley.

166.    Also in 2005, the EPA fined DuPont $16.5 million, then the largest civil administrative penalty the agency had ever issued, for the company's failure to report possible health risks associated with PFOA.

167.    With the writing on the wall and upon invitation by the EPA, DuPont agreed in 2006 to join the "PFOA Stewardship Program" working towards the elimination of PFOA by 2015.

168.    In the meantime, however, the company continued to manufacture PFOA, and at least until 2008 the company made fluorotelomers with PFOA byproducts for the express and intended purpose of being used in the manufacture of AFFF.

169.    The C8 Science Panel completed its research in 2013, finding likely connections between PFOA and high cholesterol, ulcerative colitis, pregnancy-induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

170.    Beginning in 2013, DuPont replaced its production and use of PFOA with GenX chemicals.

171.    GenX is the trade name for the short-chain PFAS chemicals, including hexafluoropropylene oxide dimer acid, that allow for the creation of fluoropolymers without PFOA.

172.    DuPont first began generating GenX in or around 1980, but it remained a chemical byproduct of other manufacturing processes until the 2010s.

173.    While DuPont, in a 2010 marketing brochure, touted GenX as having "a favorable toxicological profile," studies have shown that exposure to GenX has negative health effects, suggestive of cancer, on the kidney, blood, immune system, developing fetuses, and especially in the liver following oral exposure.

174.    Further, like PFOA and other PFAS compounds, GenX is persistent in the environment, not readily biodegradable, and mobile in the presence of water.

175.    DuPont acknowledged in the same brochure referenced above that GenX "is chemically stable and, if released, would be environmentally persistent."

176.    Following the 2015 Chemours Separation and Spin Transaction, Chemours took over production of legacy DuPont PFAS chemistry, including GenX.

177.    Like DuPont, Chemours has, since 2015, designed, manufactured, marketed, distributed, and sold its PFAS compounds, including GenX, for use in AFFF products.

178.    On information and belief, the remaining Defendants also knew, or should have known, that in its intended and common use, PFAS-based AFFF and/or AFFF component products would injure and/or threaten the environment and public health.  This information was accessible to each of them, including as part of their ongoing involvement in various trade associations constituted for the purpose of defending the AFFF franchise, including the Firefighting Foam Coalition ("FFFC").

179.    Additionally, all Defendants knew or, at a minimum, should have known that their PFAS-based AFFF and/or AFFF component products, given their chemical composition, easily dissolve in water (and indeed the products were designed to be mixed with water and sprayed on the ground), are mobile, resist degradation, and tend to bioaccumulate and biomagnify.

180.    Despite their knowledge of the harmful properties of PFAS chemicals, following 3M's withdrawal from the PFOA/PFOS market beginning in or around 2000, DuPont and the other Defendants made renewed commitments to protect their lucrative AFFF lines of business.

181.    In response to concerns expressed by the EPA regarding the environmental viability of AFFF, the FFFC was formed in 2001, partly to dispel such concerns.  DuPont was a founding member.  At least Tyco/Ansul, Chemguard, National Foam, and Dynax were also members.

182.    The FFFC lobbied hard for AFFF.  At conferences, in journals, and in meetings with the military, the EPA, and other regulators, it repeated a key talking point:  only one PFAS chemical, PFOS, had been taken off the market.  Thus, the FFFC asserted, since the FFFC members' products did not contain PFOS (but rather PFOA and other PFAS chemicals, which Defendants knew or, at a minimum, should have known were equally harmful to the environment and public health), their products were safe.

183.    DuPont and other Defendants eventually transitioned to the use of short-chain fluorotelomers with a maximum of six carbon atoms, claiming those chemicals are safer to environmental and human health.

184.    Even if such claims were true, Defendants could have begun much earlier to transition from long-chain to short-chain fluorotelomers.  Their failure to avail themselves of what they claim is a feasible alternative to the then-current formulations of PFAS-based AFFF that substantially mitigates the risk of human and environmental harm from AFFF products only confirms that their products based on long-chain fluorotelomers were not reasonably safe for their intended applications.

185.    Moreover, effective fluorine-free firefighting foams that do not pose the same risks to human health and the environment as Defendants' products exist and are used in some of the world's largest airports, including London Heathrow, London Gatwick, Copenhagen, Stuttgart and Dubai, amongst others.

186.    All 27 of Australia's airports have been using fluorine-free foams for many years.

187.    Indeed, leading fire safety and regulatory experts have opined that there are simply no justifications for continued use of toxic foams given this successful, widespread use of the environmentally safe alternative.

188.    According to a report issued by a panel of experts of IPEN, a global network of public interest NGOs dedicated to the reduction of toxic chemicals, fluorine-free firefighting (F3) foams are viable alternatives to fluorinated AFFF and comparable by all measures.

189.    But unlike fluorinated foams, F3 foams do not pollute the environment indefinitely, or put human or animal health at risk; there is no expensive clean up; remediation costs are negligible or zero; and there are no significant legal and financial liabilities.  Public health values

such as clean drinking water are not compromised, and, finally, there is no erosion of public confidence in political institutions and government agencies.

190.    Defendants failed to adequately research and investigate the design, manufacture, or sale of fluorine-free firefighting foam, or did so and concealed their results.  They avoided fluorine-free alternatives to protect their existing, lucrative AFFF lines of business.

191.    Defendants' failure to pursue this feasible alternative to PFAS-based AFFF further confirms that their AFFF products were not reasonably safe for their intended applications.

E.    **DEFENDANTS' AFFF PRODUCTS HAVE CAUSED (AND CONTINUE TO CAUSE) WIDESPREAD ENVIRONMENTAL CONTAMINATION WITH PFAS IN ANNE ARUNDEL COUNTY.**

192.    Defendants' PFAS-based AFFF products have been used for decades at locations and facilities throughout Maryland, including in Anne Arundel County and surrounding areas in which Anne Arundel County water and other resources are located, and in locations and facilities in Maryland and surrounding states situated upstream and/or upgradient from Anne Arundel County's resources.

193.    As a result, PFAS contamination attributable to the use and disposal of Defendants' PFAS-based AFFF products now afflicts Anne Arundel County resources and properties, including without limitation drinking water supplies, drinking water treatment systems, wastewater systems, stormwater conveyed and discharged through municipal stormwater systems, and surface waters in and near Anne Arundel County.

194.    The scope of contamination of Anne Arundel County resources and properties remains a subject of ongoing investigation.  Discovery is required to ascertain the specific locations or facilities at and from which PFAS-based AFFF products have been used and disposed.

195.    There are numerous facilities using AFFF products in and near Anne Arundel County, including airports, helipads, firefighting training grounds, military bases and installations

(such as Fort Meade near Odenton and the former Naval Surface Warfare Center in Annapolis), as well as industrial refineries and other facilities known to have utilized AFFF products on-site.

196.    During firefighting and firefighting training exercises at or near these and other sites, firefighters sprayed PFAS-based AFFF, per its intended use, directly on or near the ground, caused it to be disposed and spilled it or otherwise caused it to be discharged or released into the environment.

197.    These activities resulted in discharges or releases of PFAS from Defendants' AFFF products into nearby surface waters, groundwater, soil, and air, as well as water infrastructure including the County's drinking water, wastewater, and stormwater systems.

198.    In short, the normal, intended, and foreseeable manner of storage, use, and disposal of Defendants' AFFF products directly resulted in the discharge or release of PFAS into, onto, and near Anne Arundel County's environmental and infrastructural resources, causing injury to the County and its inhabitants.

199.    PFAS compounds have been detected in a range of County resources and properties, including in:

      a.    Effluent at the Annapolis Wastewater Treatment Plant;

      b.    Effluent at the Broadneck Wastewater Treatment Plant;

      c.    Effluent at the Broadwater Wastewater Treatment Plant;

      d.    Effluent at the Cox Creek Wastewater Treatment Plant;

      e.    Effluent at the Maryland City Wastewater Treatment Plant;

      f.    Effluent at the Patuxent Wastewater Treatment Plant;

      g.    Effluent at the Piney Orchard Wastewater Treatment Plant;

      h.    The Dorsey Road Water Treatment Plant;

    i.   Groundwater wells in the Glen Burnie/Broadneck water system;

    j.   Groundwater wells in proximity to a former Fort Meade fire training area;

    k.   Leachate from the Millersville landfill;

    l.   Leachate from the former Glen Burnie Sanitary Landfill located at Dover Road.

200.    As a result of such detections, the County has had to adapt or modify its programs to take account of PFAS contaminants, including its Advanced Water Treatment program intended to improve long-term water supply resiliency of the region and improve water quality in the Chesapeake Bay.

201.    Upon information and belief, PFAS-based AFFF and/or AFFF component products designed, manufactured, marketed, provided, supplied, sold, and/or distributed by each Defendant were discharged or released into the environment at or from such sites.

202.    The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not fully or sufficiently describe the human and animal health and environmental hazards of PFAS-based AFFF about which Defendants knew or should have known.

203.    The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not provide appropriate warnings and instructions concerning the environmentally safe use and disposal of PFAS-based AFFF that were known or should have been known to Defendants.

204.    The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products and/or AFFF component, if any, during the

times relevant to the claims in this Complaint did not provide appropriate instructions regarding how to design a firefighting testing site, or what precautions are necessary to take at such testing sites, in a manner that would potentially eliminate or limit the release of PFAS into the environment, even though the hazards of failing to appropriately contain PFAS were known or should have been known to Defendants.

205.    For example, instructions to install a liner under a testing area or outfitting area test-sites with appropriate water filtration systems could have significantly contained the spread of PFAS into the environment.  Defendants knew this, but failed to warn or instruct anyone that their products should only be stored, used, and disposed in conjunction with an effective liner or catch basin, or water filtration system capable of removing PFAS before it could contaminate natural resources and water infrastructure.

206.    The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not provide appropriate warnings of potential groundwater pollution with PFAS nor advised the AFFF user to install appropriate water filtration devices to protect Anne Arundel County's resources and properties, even though Defendants knew or should have known about the inevitability of groundwater, air, and soil contamination through the ordinary and intended use of their PFAS-based AFFF products and consequent adverse effects.

207.    Sampling of Anne Arundel County waterbodies has revealed the presence of PFAS constituents utilized in AFFF products, including PFOS, PFOA, PFHxS, and others.

208.    Such PFAS contaminants are also present in the County's water infrastructure.  For example, through natural processes following use of Defendants' PFAS-based AFFF products,

such contaminants inevitably have entered the County's drinking water, wastewater, and stormwater systems and continually recirculate through effluent discharge and storm events.

209.    Additionally, the U.S. Department of Defense ("DOD") has identified elevated concentrations of PFAS in surficial aquifers and groundwater resources throughout Maryland.

210.    The State of Maryland and the DOD have similarly confirmed the presence of PFAS contamination, and the fact that PFAS have been released into natural resources as a result of AFFF usage, at various locations in and near Anne Arundel County and its resources, such as Fort Meade (near Odenton) and the former Naval Surface Warfare Center (Annapolis).

211.    In addition to the announced impending EPA action to regulate PFAS under CERCLA, the MDE is rapidly moving to develop a regulatory framework to systematically address PFAS contamination, imposing additional costs on the County as it operates its drinking water, wastewater, and stormwater systems, and maintains its public and natural resources.

212.    Recently, the MDE has announced that, as part of its Stormwater Pollution Prevention Program, its draft requirements for a general permit to operate an industrial stormwater system will mandate that the permittee identify potential sources of PFAS that could be exposed to stormwater and list and address those sources.

213.    In addition, effective September 1, 2021, the MDE issued the first discharge permit for waste treatment that requires monitoring for PFAS.  The MDE has made clear that it is actively intent on assessing PFAS risks and taking regulatory actions "to reduce unacceptable human health risk and continuing releases of these materials into the environment…."

214.    The County's obligations under impending federal and state environmental regulations to identify, monitor, assess, analyze, and prevent, mitigate, remove or remediate PFAS

contamination of its water infrastructure and public and natural resources are therefore considerable and imminent, driven in large part by PFAS from AFFF products.

215.    Anne Arundel County and its residents have suffered and will continue to suffer injuries as a result of Defendants' conduct, including without limitation past costs incurred to monitor, sample, evaluate, assess, investigate, and analyze PFAS concentrations in the County's water infrastructure, waterbodies, and other resources and properties; future costs to monitor, sample, evaluate, assess, investigate, and analyze PFAS concentrations in the County's water infrastructure, waterbodies, and other resources and properties; costs to control, reduce, or remove PFAS and to remediate or restore impacted resources; costs to educate and inform residents about PFAS issues; and loss of use of resources and property, including water infrastructure and surface waters and other public and natural resources.

**F.    Historical DuPont's Fraudulent Scheme To Insulate Its Assets From Its PFAS Liabilities**

216.    After Historical DuPont had been sued and faced the threat of further lawsuits regarding its manufacturing and releases of PFOA, it announced in October 2013 its intention to spin off its "performance chemicals" business, responsible for manufacturing and sales of PFAS and PFAS-containing products, including PFOA.  The performance chemicals business would be spun off as a new, independently owned company named The Chemours Company (the Chemours Spin-off) that would assume certain liabilities of Historical DuPont.

217.    In February 2014, Historical DuPont formed The Chemours Company as a wholly-owned subsidiary with a separate board of directors that was controlled by Historical DuPont employees.

218.    According to a lawsuit filed by Chemours against Historical DuPont, DowDuPont, and Corteva in 2019, the Chemours Spin-off was not an arm's length transaction.  *See* Chemours's

Verified First Amended Complaint, C.A. No. 2019-0351-SG (Del. Ch.) (the Chemours Compl.), ¶ 25.[1] From formation through consummation of the Chemours Spin-off, Historical DuPont controlled development of the Chemours Spin-off's terms, dictated the terms of the Chemours Spin-off, and there were no procedural protections for Chemours. *Id*. ¶¶ 25, 27.

219.    Historical DuPont did not allow Chemours (or its prospective management team) to have independent counsel to represent Chemours's interests in structuring the Chemours Spin-off. *Id.* ¶ 26. Instead, Historical DuPont and its outside counsel unilaterally prepared all of the documents underlying and effectuating the Chemours Spin-off. *Id*.

220.    The initial draft of the "Separation Agreement" between Historical DuPont and Chemours (the Chemours Separation Agreement) did not include the schedules listing the assets and liabilities to Chemours, preventing Chemours's designated management team from evaluating central economic terms of the transaction even though Chemours's designated management team requested these schedules. *Id.* ¶ 29.

221.    On May 12, 2015, the Chemours Board, which then consisted of three Historical DuPont employees, Michael Heffernan, Nigel Pond, and Steven Zelac (the DuPont Employee Board Members) who were not going to be with Chemours following the Chemours Spin-off, authorized the Dividend (as defined below). *See id.* ¶ 35(a).

222.    On June 5, 2015, the DuPont Board approved the Chemours Spin-off. *Id.* ¶ 70.

223.    On June 9, 2015, DuPont Employee Board Members, as the sole members of the Chemours' Board, held a DuPont Board "meeting" to "discuss" whether Chemours should approve the Chemours Spin-off and the Chemours Separation Agreement. *Id.* ¶ 35(c). That meeting was

---

[1] A copy of the Chemours Complaint is available at: https://www.chemours.com/en/-/media/files/corporate/fayetteville-works/chemours-amended-complaint.pdf.

also attended by other Historical DuPont employees and Historical DuPont's outside counsel. *Id.* The meeting consisted of "presentations" by Historical DuPont's outside counsel and Historical DuPont. *Id.* The DuPont Employee Board Members (1) took "notice" that "DuPont, as the sole stockholder of [Chemours], has communicated" that the DuPont Board had determined that the Chemours Spin-off "are in DuPont's best interests," and (2) "unanimously" adopted resolutions approving the Chemours Spin-off on Chemours's supposed behalf. *Id.*

224.    On June 26, 2015, Nigel Pond, Historical DuPont's M&A Counsel, formerly one of the DuPont Employee Board Members, and then designated a "Vice President" of Chemours (a temporary position he would resign immediately thereafter), executed the Chemours Separation Agreement on Chemours's behalf. *Id.* ¶ 35(d).

225.    On July 1, 2015, Michael Heffernan, Nigel Pond, and Steven Zelac all resigned from the Chemours Board.

226.    In connection with the Chemours Spin-off, Historical DuPont and Chemours executed the Chemours Separation Agreement, dated as of June 26, 2015.

227.    On May 12, 2015, Chemours borrowed over $4 billion through Senior Secured Term Loans (the Term Loans), Notes, and related indentures.

228.    The Term Loans were incurred pursuant to the terms of the Credit Agreement, dated May 12, 2015, by and among Chemours, certain Guarantors party thereto and JPMorgan Chase Bank, N.A., as administrative agent. *See* Chemours's Form 10, Amendment No. 3, Ex. 10.14, filed on May 13, 2015 (as amended) (the Credit Agreement).

229.    The Information Statement for the Chemours Spin-off dated June 5, 2015 (the Info Statement), disclosed that a "Dividend" of over $3.9 billion would be paid to Historical DuPont by Chemours.

230.    As part of the Chemours Spin-off, Chemours received approximately 19% of Historical DuPont's business lines, while being saddled with approximately two-thirds of Historical DuPont's environmental liabilities and 90% of Historical DuPont's pending litigation by volume of cases.  Chemours Compl., ¶ 38.

231.    These environmental liabilities included those related to over 80 Historical DuPont-associated sites, the majority of which were sites that Chemours would never operate.  *Id.* ¶ 39.

232.    Historical DuPont even gave Chemours all liabilities related to Historical DuPont's historical explosives operations and asbestos and benzene exposures that had nothing to do with its performance chemicals business.

233.    As a result of the Chemours Spin-off, Chemours's capital structure carried a debt-to-EBITDA (earnings before interest, taxes, depreciation, and amortization) ratio of 7.3 to 1.0.  *Id.* ¶ 41.

234.    Under the Chemours Separation Agreement, The Chemours Company agreed to defend and indemnify Historical DuPont against, and assumed for itself, all "Chemours Liabilities," defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time."  This indemnification is uncapped and does not have a survival period.

235.    The Chemours Company agreed to indemnify Historical DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Chemours Spin-off; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence,

gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Historical DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

236.    The Chemours Company agreed to indemnify Historical DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spin-off if they were "primarily associated" with the Performance Chemicals Business.  Such liabilities were deemed "primarily associated" if Historical DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

237.    The Chemours Company also agreed to use its best efforts to be fully substituted for Historical DuPont with respect to "any order, decree, judgment, agreement or [any litigation or investigation] with respect to Chemours Assumed Environmental Liabilities" in effect at the time of the Chemours Spin-off.  Chemours Separation Agreement at § 6.10(b).

238.    The schedules to the Chemours Separation Agreement, as referenced in the "Chemours Assumed Environmental Liabilities" definition, have never been publicly filed.

239.    The Chemours Spin-off was predicated upon a determination that Chemours would be solvent following the Chemours Spin-off (*see* Chemours Separation Agreement at § 4.5(e)), but that solvency opinion was based upon faulty and fictitious certified "maximum" liability figures that were unrealistic and designed to mask Chemours's insolvency.

240.    Houlihan Lokey (Houlihan) was commissioned to provide a financial opinion regarding Chemours's solvency on the date of the Chemours Spin-off.  *See* Chemours Compl., ¶¶ 49-50.  Houlihan's opinion, however, was based on Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for dozens of sites that were given to it by Historical DuPont.  *Id.* ¶ 50.

241.    DuPont engineered the "High End Maximum Realistic Exposure" figures to massively understate the real potential maximum exposure. *Id.* ¶ 56.

242.    In May 2015, Historical DuPont demanded that Chemours's newly appointed chief financial officer (Mark E. Newman) certify to the accuracy of the "High End (Maximum) Realistic Exposure" numbers. *Id*. ¶ 52. Newman conditioned his certification upon Historical DuPont's acknowledgement that it supplied the maximum liability numbers, which Historical DuPont did through "Backup Certificates" signed by its employees. *Id.*

243.    Historical DuPont understated the real maximum liabilities related to the Chemours Spin-off.

244.    For multiple categories of litigation (such as PFOA, other PFAS, and benzene), Historical DuPont does not appear to have undertaken any analysis. *Id*. ¶ 58. Rather, Historical DuPont's certification invoked a supposed "analysis" of the maximum liabilities done by Deloitte Transactions and Business Analytics LLP (Deloitte). *Id*. But Deloitte did not certify those "maximums." *Id.*

245.    Prior to the closing of the Chemours Spin-off, Chemours's management complained to Historical DuPont's senior management that Chemours would lack appropriate cash reserves. *See* Chemours Compl., ¶ 51.

246.    In June 2015, Historical DuPont summarily rejected the plea of Chemours's chief financial officer for an additional $200-300 million in cash reserves to function on day one. *Id.* ¶ 32.

247.    Historical DuPont ignored the concerns of Chemours's management that paying quarterly stockholder dividends of $100 million would adversely affect Chemours's cash position.

*Id.* ¶ 51.  Chemours's management went on to cut future dividends to almost zero after the Chemours Spin-off.  *Id.* ¶ 74.

248.    On July 1, 2015, Historical DuPont spun off Chemours.

249.    Chemours's financial condition at the time of the Chemours Spin-off was rapidly deteriorating and Chemours as an independent company was suffering from slumping EBITDA.

250.    In the midst of weakness in the global titanium dioxide market cycle and continued foreign currency impacts, Chemours had vastly overstated its own financial health.

251.    Chemours's financial condition was much worse at the time of the Chemours Spin-off than Chemours and Historical DuPont publicly disclosed.

252.    At the time of the Chemours Spin-off, Chemours's debt-to-EBITDA ratio was 7.3 to 1.0.  *Id.* ¶ 41.  This ratio far exceeded the Credit Agreement's maximum "Total Net Leverage Ratio," barring Chemours from accessing $1 billion of revolving loans.  *See* Credit Agreement, § 6.13.

253.    Chemours suffered a liquidity shortage within months of the Chemours Spin-off. Chemours Compl., ¶ 75.  As a result, Chemours laid off 1,000 employees, shut plants or production lines in Delaware and Tennessee, sold off business lines, undertook two corporate restructurings, and made multiple amendments to the Credit Agreement.  *Id.* ¶ 76.

254.    In November 2015, Chemours announced that it would sell to Dow its facility in Beaumont, Texas for approximately $140 million in cash.  *Id.* ¶ 77.

255.    In February 2016, Historical DuPont advanced Chemours $190 million to pay for goods and services to be provided to Historical DuPont through mid-2017.  *Id.*

256.    As of the last trading date before the Chemours Spin-off closed, the markets reflected Chemours's insolvency.[2]  As set forth in Chemours's publicly filed financial statements, the market believed that Chemours was insolvent by $77 million.

257.    On August 6, 2015, Chemours filed its first Form 10-Q following the Chemours Spin-off, containing a deconsolidated balance sheet as of June 30, 2015, immediately prior to the Chemours Spin-off, reflecting Chemours's insolvency by at least $309 million.

258.    Just three months after the Chemours Spin-off, Chemours was insolvent by $829 million based upon the value of its traded debt.

259.    In 2005, Historical DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.  Under the terms of the 2005 class action settlement, Historical DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

260.    Also in 2005, Historical DuPont agreed to pay $16.5 million to resolve eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

261.    The C8 science panel completed its research in 2013 and found several significant diseases, including cancer, with a probable link to PFOA.  Thereafter, more than 3,500 personal

---

[2] Chemours's share price, originally pegged by DuPont at $21 per share, declined to $11.48 within a month, and to $3.16 within six months.  Chemours Compl., ¶ 65.

injury claims were filed in Ohio and West Virginia (in connection with the 2005 class-action settlement) that were consolidated into a multidistrict litigation court in Ohio (the Ohio MDL).[3]

262.    At the time of the Chemours Spin-off, Historical DuPont certified to Houlihan a "maximum" liability figure for the 3,500 cancer and other bodily injury claims relating to PFOA of $128 million. *Id.* ¶¶ 82, 84.

263.    In mid-2016, Historical DuPont lost the first three bellwether trials, the first having gone to trial just two months after the Chemours Spin-off. Juries returned multi-million dollar verdicts against Historical DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their illnesses, in the total amount of $19.7 million. *Id.* ¶ 85.

264.    On February 13, 2017, Historical DuPont and The Chemours Company reached a global settlement of the Parkersburg, West Virginia cases agreeing to pay $670.7 million to resolve the Ohio MDL. *Id.* ¶¶ 89-90.

265.    At the time of the Chemours Spin-off, Historical DuPont certified Chemours's "maximum" exposure as $2.09 million with respect to Historical DuPont's Fayetteville Works operation in North Carolina. *Id.* ¶ 93. At the time of the Chemours Spin-off, Historical DuPont knew that the Fayetteville plant had been discharging PFAS for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people. *Id.* ¶ 94.

266.    Beginning in September 2017, the State of North Carolina, public water authorities, well owners, and a consolidated putative class of North Carolina residents, among others, filed suit against Chemours and/or Historical DuPont. *Id.* ¶ 97.

---

[3] Under the settlement, if the science panel found a "probable link" as to a disease, plaintiffs having that disease could then bring personal injury actions against DuPont, and DuPont could not defend by contesting general causation. *See* Chemours Compl., ¶¶ 82-83.

267. In February 2019, Chemours entered into a judicially approved consent order with the State of North Carolina to resolve North Carolina's claims arising from Historical DuPont's long-running discharges into the Cape Fear River and contamination of area groundwater. *Id.* ¶ 99. That consent order requires Chemours to take steps to remediate Historical DuPont's historical contamination and to implement environmental protection measures at a cost of more than $200 million. Additionally, a number of private lawsuits relating to Historical DuPont's activities in the region remain outstanding, including a class action.

268. At the time of the Chemours Spin-off, Historical DuPont certified that the "maximum" Chemours could have to pay for total New Jersey environmental liabilities was $337 million, divided among different sites in New Jersey. *Id.* ¶ 101. In 2018, in connection with the DowDuPont spin-off, Historical DuPont revised its liability estimate upward to approximately $620 million. *Id.* The State of New Jersey has criticized even Historical DuPont's upward-revised estimates, claiming it "implausible" that these amounts could represent "good-faith estimates of [Historical DuPont's historical New Jersey] environmental obligations and liabilities." *Id.*

269. For benzene-related liabilities, Historical DuPont certified a "maximum" liability of $17 million, including defense costs, at the time of the Chemours Spin-off. *Id.* ¶ 108. In 2018, Historical DuPont provided Chemours with a more comprehensive study valuing the potential maximum costs for benzene-related liabilities at over $111 million. *Id.* Historical DuPont addressed PFAS litigation, if at all, as part of a catch-all "maximum" of $194 million covering "General Litigation . . . to Perpetuity," which apparently included everything from PFAS liabilities to commercial litigation. *Id.* ¶ 110.

270. Significant additional environmental and other litigation arising from Historical DuPont's performance chemical business was likewise pending or threatened at the time of the

Chemours Spin-off and additional lawsuits continue to be filed against Historical DuPont relating to its performance chemicals business.

271.    In 2017, Chemours then also agreed, in an amendment to the Chemours Separation Agreement, to pay Historical DuPont $25 million for future PFOA costs not covered by the Chemours Separation Agreement for each of the next five years (up to an additional $125 million). Historical DuPont also agreed to cover additional amounts up to $25 million for five years, with Chemours taking responsibility for any amounts greater than $50 million.

272.    The effect of the Chemours Spin-off was to segregate a large portion of Historical DuPont's environmental (and other) liabilities, including liabilities related to its manufacturing, use, and disposal of PFAS compounds, and give them to an undercapitalized entity, thus attempting to limit the funds available to satisfy Historical DuPont's legacy liabilities.

273.    Given that Chemours is allegedly responsible for all or substantially all of Historical DuPont's historic environmental liabilities, is saddled with debt, and has comparatively few assets, the separation and spin-off have been described by some market commentators as "a bankruptcy waiting to happen" and "complete securities fraud."

274.    On December 11, 2015, Historical DuPont announced a merger with Old Dow into the combined DowDuPont (the Merger).  DowDuPont would eventually, in 2019, split into three independent companies: an agriculture company, a materials science company, and specialty products company.  These actions were all a continuation of the fraudulent Chemours Spin-off, which was a necessary precondition to these later mergers and spins.

275.    The DowDuPont Merger closed on August 31, 2017, with Old Dow and DuPont each becoming wholly owned subsidiaries of DowDuPont.

276.    After the completion of the Merger, DowDuPont engaged in a number of internal transactions, realignments, and diversities, that resulted in the transfer, directly or indirectly, of a substantial portion of what had been Historical DuPont's assets from the combined DowDuPont.

277.    Pursuant to an April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the DowDuPont Separation Agreement), DowDuPont jettisoned away from Chemours's and Historical DuPont's creditors DowDuPont's agriculture chemical and seed business (which went with Corteva) and DowDuPont's materials science business (which went with New Dow) (the DowDuPont Separation).

278.    The spin-off of DowDuPont's materials science division into New Dow (the Dow Spin-off) occurred on April 1, 2019, and New Dow became an independent, publicly traded company on April 1, 2019.  New Dow was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the materials science business, and Corteva Inc. was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the agriculture business.  The Dow Spin-off was accomplished through a pro rata dividend in-kind of all of New Dow's then-issued and outstanding shares of common stock, to holders of DowDuPont's common stock as of the close of business on March 21, 2019 (the Dow Distribution).

279.    The spin-off of DowDuPont's agriculture chemical and seed business to Corteva (a.k.a. Corteva Agriscience) (the Corteva Spin-off) occurred on June 1, 2019.  The Corteva Spin-off was accomplished through a pro rata dividend in-kind of all of the then-issued and outstanding shares of Corteva's common stock, to holders of Historical DuPont's common stock as of the close of business on May 24, 2019 (the Corteva Distribution).

280.    In connection with the Dow Distribution and the Corteva Distribution, DowDuPont entered into certain agreements that, among other things, effect the separations,

provide for the allocation of assets, employees, liabilities, and obligations (including its investments, property and employee benefits and tax-related assets and liabilities) among DowDuPont, New Dow, and Corteva.

281.    Pursuant to the DowDuPont Separation and Distribution Agreement as well as a June 1, 2019 "Letter Agreement," DowDuPont agreed to indemnify both New Dow and Corteva against certain litigation, environmental, workers' compensation, and other liabilities that arose prior to the distribution.

282.    On or about June 1, 2019, DowDuPont changed its name to DuPont de Nemours, Inc. (i.e., New DuPont), which now holds the former conglomerate's specialty products business.

283.    The DowDuPont board of directors believed the completion of the post-Merger separations was—in DowDuPont's words—"the best available opportunity to unlock the value of DowDuPont's businesses."  The practical effect of the post-Merger separations was to frustrate and hinder creditors of Historical DuPont and Chemours by moving valuable assets further away from Historical DuPont.

284.    As a result of these transactions, the assets Historical DuPont had held following the Chemours Spin-off, including the Dividend and/or the proceeds or products thereof, are now distributed across three companies:  DowDuPont, New Dow, and Corteva.

285.    Many details about these transactions are hidden from the public in confidential and/or non-public schedules and exhibits to the various agreements and this has hampered creditors' efforts to understand the final disposition of Historical DuPont's valuable assets and the adequacy of the consideration received in return.

286.    Pursuant to the DowDuPont Separation Agreement, DowDuPont and Corteva assumed direct financial liability of Historical DuPont, including liability that was *not* related to

the agriculture, materials science, or specialty products businesses.  Corteva was allocated 29% of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business.  DowDuPont was allocated 71% of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business.

287.    Liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested have been allocated between Corteva and DowDuPont as set forth in the non-public confidential schedules to the DowDuPont Separation Agreement.  To the extent that liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested are not listed on the non-public confidential schedules to the DowDuPont Separation Agreement, each of DowDuPont and Corteva may be responsible for $200 million each in the aggregate, and once liability exceeds the aggregate cap, then excess liability will be allocated to the other.  In the event such liabilities exceed $200 million in the aggregate for each of DowDuPont and Corteva, liabilities are allocated 71% to DowDuPont and 29% to Corteva.

288.    The DowDuPont Separation Agreement allocates DowDuPont's assets among DowDuPont, New Dow, and Corteva.  Similarly, the DowDuPont Separation Agreement allocates DowDuPont's liabilities, including the liabilities of Historical DuPont.

289.    While the non-public nature of the schedules to the DowDuPont Separation Agreement obscures the precise extent of the liabilities retained by New Dow and those transferred to Corteva, the DowDuPont Separation Agreement caused Corteva and DowDuPont to bear the brunt of liabilities for Historical DuPont, including Historical DuPont's legacy PFAS liabilities and the liabilities of its former performance chemicals business.

290. As a result of the Merger, DowDuPont was not a good-faith transferee of the proceeds of the Dividend because DowDuPont had sufficient knowledge about the Chemours Spin-off to induce it to inquire further about that transaction.

291. In each of the Dow Spin-off and the Corteva Spin-off, neither the newly created New Dow nor Corteva were good-faith transferees of the proceeds of the Dividend, because each of New Dow and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

292. New Dow was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by New Dow in the Dow Spin-off because New Dow had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce New Dow to inquire further about those liabilities.

293. Likewise, Corteva was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by Corteva in the Corteva Spin-off because Corteva had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce Corteva to inquire further about those liabilities.

294. Prior to the Dow Spin-off, Old Dow's March 31, 2019 consolidated balance sheet reflected tangible assets of $49,153,000,000 and balance sheet liabilities of $51,591,000,000. Following the Dow Spin-off, New Dow's June 30, 2019 consolidated balance sheet reflected balance sheet tangible assets of $39,887,000,000 and balance sheet liabilities of $46,389,000,000. Thus, Old Dow's and New Dow's balance sheets' liabilities *exceeded* their balance sheet tangible assets, for Old Dow before the Dow Spin-off, and for New Dow after the Dow Spin-off.

295.    Before the Corteva Spin-off, Historical DuPont's March 31, 2019 balance sheet reflected tangible assets of $31,327,000,000 and liabilities of $32,002,000,000.  After the Corteva Spin-off, (i) Corteva's June 30, 2019 consolidated balance sheet, which includes Historical DuPont, reflected tangible assets of $19,064,000,000 and liabilities of $17,855,000,000 and (ii) Historical DuPont's June 30, 2019 balance sheet reflected tangible assets of $19,071,000,000 and liabilities of $21,928,000,000.  Thus, Historical DuPont's balance sheet liabilities *exceeded* its balance sheet tangible assets both before *and* after the Corteva Spin-off.  Additionally, after the Corteva Spin Transaction, Historical DuPont's liabilities included a $4.16 billion intercompany loan to Corteva.

296.    Prior to the Dow Spin-off and the Corteva Spin-off, Historical DuPont's balance sheet reflected an aggregate total cash, cash equivalents, and marketable securities of $3,814,000,000.  After the Dow Spin-off and the Corteva Spin-off, DowDuPont's balance sheet reflected an aggregate total cash, cash equivalents and marketable securities of $2,083,000,000.

297.    The Chemours Spin-off, the Dow Spin-off, and the Corteva Spin-off (collectively, the Spin Transactions), were a coordinated series of transactions through which Historical DuPont sought to spin-off (and separate) profitable and valuable assets, free and clear of billions of dollars of legacy environmental liabilities, including PFOA and PFAS liabilities.

298.    The Chemours Spin-off was part of a single integrated scheme that included the Dow Spin-off and the Corteva Spin-off.

299.    While the Spin Transactions as a whole are relevant to the fraudulent schemes alleged herein, each of the Spin Transactions constituted an actual or constructive fraudulent transfer of assets.

## FIRST CAUSE OF ACTION
### PUBLIC NUISANCE

300.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-299 as if fully restated in this cause of action.

301.    Plaintiff brings this cause of action in its governmental capacity.  This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of drinking water, wastewater, and stormwater systems, and waterbodies and other public and natural resources, and is brought solely for the public benefit.

302.    Defendants designed, manufactured, distributed, marketed, and promoted PFAS-based AFFF products and/or AFFF component products in a manner that created or contributed to the creation of a public nuisance that is harmful to health and obstructs the free use of the County's water systems, waters, and public resources.

303.    Defendants intentionally designed, manufactured, distributed, marketed, and sold PFAS-based AFFF products and/or AFFF component products with the knowledge that they inevitably and foreseeably caused environmental contamination when used as intended.

304.    Defendants knew that their PFAS-based AFFF products and/or AFFF component products would likely end up in the County's water systems, waterways, waterbodies, and other public resources when used as intended, including in and around Anne Arundel County.

305.    Defendants' conduct and the presence of PFAS contamination in Anne Arundel County water systems, waterways, waterbodies, and other public resources annoys, injures, and endangers the comfort, repose, health, and safety of others.

306.    Defendants' conduct and the presence of PFAS contamination in Anne Arundel County water systems, waterways, waterbodies, and other public resources interferes with and obstructs the public's free use and comfortable enjoyment of the County's waters for drinking and

household and commercial use, and for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

307.   The presence of PFAS contamination in Anne Arundel County water systems, waterways, waterbodies, and other public resources also interferes with the County's and its residents' interest in a healthy and ecologically sound environment.

308.   Defendants' conduct and the presence of PFAS contamination in Anne Arundel County water systems, waterways, waterbodies, and other public resources is injurious to human, animal, and environmental health.

309.   An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PFAS that endanger the health of fish, animals, and humans and degrade water quality and marine habitats.

310.   The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in designing, manufacturing, marketing, distributing, and selling PFAS-based AFFF products and AFFF component products and concealing the dangers posed to human health and the environment.

311.   The rights, interests, and inconvenience to the County and general public far outweighs the rights, interests, and inconvenience to Defendants, which profited heavily from the manufacture and sale of PFAS-based AFFF products and AFFF component products.

312.   Defendants' conduct caused and continues to cause harm to the County.

313.   The County has suffered and will continue to suffer damage from Defendants' PFAS-based AFFF products and AFFF component products.

314.   Defendants knew or, in the exercise of reasonable care, should have known that the design, manufacture, marketing, distribution, and sale of PFAS-based AFFF products and AFFF

component products causes the type of contamination now found in the County's water systems, waterways, waterbodies, and other public resources.

315.    Defendants knew that PFAS would contaminate water supplies and infrastructure, degrade marine habitats and endanger birds and animals, as a result of the ordinary and intended use of their products.

316.    In addition, Defendants knew PFAS and PFAS-based products are associated with serious illnesses and cancers in humans and that humans may be exposed to PFAS through ingestion of contaminated water, fish or other foods, and/or dermal contact.

317.    Defendants' conduct in designing, manufacturing, distributing, selling and promoting PFAS-based AFFF products and AFFF component products constitutes an unreasonable interference with a right common to the general public, i.e., the right to freely use the County's water systems, waterways, waterbodies, and other public resources without obstruction and health hazard.

318.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the County and the public about the human and environmental risks posed by its PFAS products, and each day on which they fail to do so constitutes a new injury to the County.

319.    The County suffered harm of a kind different from that suffered by members of the general public, including the costly damage to its water supplies and infrastructure, which it operates and/or maintains for the public welfare.

320.    As a direct and proximate result of Defendants' creation of a public nuisance, the County has suffered, and continues to suffer, monetary damages to be proven at trial.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY- DEFECTIVE DESIGN

321.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-299 as if fully restated in this cause of action.

322.    Plaintiff brings this cause of action in its governmental capacity.  This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of drinking water, wastewater, and stormwater systems, and waterbodies and other public and natural resources, and is brought solely for the public benefit..

323.    Defendants' PFAS-based AFFF products and AFFF component products were not reasonably safe as designed at the time the products left Defendants' control.

324.    The toxicity, solubility, volatility, persistence, bioaccumulative tendency, and inability of PFAS compounds to be contained rendered Defendants' PFAS-based AFFF products and AFFF component products unreasonably dangerous at all times.

325.    Defendants' PFAS-based AFFF products and AFFF component products were unsafe as designed.

326.    Due to their toxicity, persistence, volatility, solubility, and inability to be contained, among other things, Defendants knew their PFAS products were not safe at the time they were manufactured because, even when used as intended, such products would inevitably produce significant environmental contamination.

327.    Defendants knew their PFAS-based AFFF products and AFFF component products were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the overwhelming seriousness of creating pervasive environmental contamination, especially of groundwaters and surface waters, which serve as drinking water supplies, in Anne Arundel County and beyond.

328. Defendants designed, manufactured, distributed, sold, and promoted PFAS-based AFFF products and AFFF component products despite such knowledge in order to maximize their profits despite the known harm.

329. At all times relevant to this action, feasible alternatives to PFAS-based AFFF products were available to Defendants, which could have eliminated, reduced, or mitigated the unreasonable dangers and hazards posed by the AFFF products as designed.

330. Any utility allegedly provided by the use of PFAS-based AFFF products and AFFF component products is greatly outweighed by the risks and dangers associated with their use.

331. The PFAS-based AFFF products and AFFF component products were placed in the stream of commerce and sold by Defendants in a defective and unreasonably dangerous condition in that they were toxic, persistent, bioaccumulative, water- and fat-soluble, and volatile (i.e., inevitably escaping their ordinary and intended applications), which resulted in contamination of waterways, wildlife, drinking water supplies, and water infrastructure, including within the County.

332. The PFAS compounds released from Defendants' AFFF products reached the County's water supplies, water infrastructure, waters, and other public resources without any substantial change in condition and were in the same condition at the time of the alleged injury to the County's resources.

333. It was foreseeable to Defendants or a reasonable manufacturer that the PFAS would reach the County's water supplies, water infrastructure, waters, and other public resources.

334. Contamination of the County's water supplies, water infrastructure, waters, and other public resources occurred because of the defective design and manufacture of the PFAS-based AFFF products and AFFF component products.

335.    Defendants' PFAS-based AFFF products and AFFF component products caused and continue to cause injury to the County.

336.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the County and the public about the human and environmental risks posed by its PFAS products, and each day on which they fail to do so constitutes a new injury to the County.

337.    The County has suffered and will continue to suffer damages in amounts to be proven at trial.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY- FAILURE TO WARN

338.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-299 as if fully restated in this count.

339.    Plaintiff brings this cause of action in its governmental capacity.  This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of drinking water, wastewater, and stormwater systems, and waterbodies and other public and natural resources, and is brought solely for the public benefit.

340.    Defendants' PFAS-based AFFF products and AFFF component products were not reasonably safe because they lacked adequate warnings at the time the products left Defendants' control.

341.    At the time Defendants designed, manufactured, distributed, sold, and promoted its PFAS-based AFFF products and AFFF component products, Defendants knew that, even when used as intended, such products would inevitably and foreseeably produce significant environmental contamination.

342. Despite Defendants' knowledge, Defendants failed to provide adequate warnings that their PFAS-based AFFF products and AFFF component products would become a pervasive contaminant and contaminate drinking water supplies, waterways, and wildlife, including in Anne Arundel County.

343. Defendants could have warned of this certainty but intentionally concealed the certainty of contamination in order to maximize profits.

344. Defendants concealed the dangers of PFAS and PFAS-based products after they designed, manufactured, distributed, promoted, and sold them, and did not issue adequate warnings or instructions to those who had previously purchased their products, and thereafter continued to design, manufacture, distribute, promote and sell PFAS-based products without adequate warnings or instructions.

345. Without adequate warnings or instructions, Defendants' PFAS-based AFFF products and AFFF component products were unsafe to an extent beyond that which would be contemplated by an ordinary person.

346. Defendants knowingly failed to issue warnings or instructions concerning the dangers of PFAS and their PFAS-based products in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

347. The PFAS-based AFFF products and AFFF component products were placed in the stream of commerce and sold by Defendants in a defective and unreasonably dangerous condition in that their design failed to include warnings or instructions sufficient and necessary for the safe and proper use and disposal of the products.

348. The PFAS compounds released from Defendants' AFFF products reached the County's water supplies, water infrastructure, waters, and other public resources without any

substantial change in condition and were in the same condition at the time of the alleged injury to the County's water supplies, water systems, waters, and other public resources.

349.    It was foreseeable to Defendants or a reasonable manufacturer that the PFAS would reach the County's water supplies, water infrastructure, waters, and other public resources.

350.    Contamination of the County's water supplies, water infrastructure, waters, and other public resources occurred because of the defective PFAS-based AFFF products and AFFF component products, in that to be non-defective and reasonably safe for use, the products should have contained or been accompanied by a warning as to their toxicity, persistence, bioaccumulativity, and volatility.

351.    Further, such contamination occurred because of Defendants' failure to adequately warn or instruct their customers as to proper disposal techniques and safeguards necessary to prevent environmental contamination resulting from the ordinary use of such products.

352.    Defendants' PFAS-based AFFF products and AFFF component products caused and continue to cause injury to the County.

353.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the County and the public about the human and environmental risks posed by its products, and each day on which they fail to do so constitutes a new injury to the County.

354.    The County has suffered and will continue to suffer damages in amounts to be proven at trial.

## FOURTH CAUSE OF ACTION
### TRESPASS

355.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-299 as if fully restated in this count.

356.    Plaintiff brings this cause of action in its governmental capacity. This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of drinking water, wastewater, and stormwater systems, and waterbodies and other public and natural resources, and is brought solely for the public benefit.

357.    As alleged above, Defendants designed, manufactured, distributed, marketed, and promoted PFAS-based AFFF products and AFFF component products in a manner that ensured that PFAS compounds would invade the County's drinking water supplies, water infrastructure, waterbodies, and other public and natural resources.

358.    As a result of such invasion, the County's drinking water supplies, water infrastructure, waterways and waterbodies, and other public and natural resources which the County operates and maintains for the public welfare, suffer contamination with toxic PFAS.

359.    Such contamination is harmful to public health and obstructs the free use of the County's water supplies, water infrastructure, waters, and other public resources.

360.    Defendants intentionally designed, manufactured, marketed, and sold PFAS-based AFFF products and AFFF component products with the knowledge that they would inevitably cause pervasive environmental contamination, including in Anne Arundel County.

361.    Defendants knew that PFAS would likely end up in the County's water supplies, water infrastructure, waterways, water bodies, sediments, and fish and animal tissues, when used as intended, including in Anne Arundel County.

362.    Defendants' conduct caused and will continue to cause injury to the County.

363.     Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the County and the public about the human and environmental risks posed by its products, and each day on which they fail to do so constitutes a new injury to the County.

364.     As a direct and proximate result of Defendants' trespass, the County has suffered, and continues to suffer, monetary damages to be proven at trial.

## FIFTH CAUSE OF ACTION
### NEGLIGENCE

365.     Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-299 as if fully restated in this count.

366.     Plaintiff brings this cause of action in its governmental capacity.  This claim is premised on Plaintiff's legislative responsibility for the maintenance and operation of drinking water, wastewater, and stormwater systems, and waterbodies and other public and natural resources, and is brought solely for the public benefit.

367.     Defendants had a duty of care to protect others against unreasonable risks resulting from the use or disposal of their PFAS-based AFFF products and AFFF component products.

368.     Defendants breached their duty by failing to conform to the requisite standard of care when they negligently, carelessly, and recklessly designed, manufactured, formulated, handled, stored, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold and otherwise distributed toxic PFAS-based products that contaminated the County's water supplies, water infrastructure, waters, and other public and natural resources.

369.     Defendants failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its toxic properties.

370.    Defendants failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

371.    Defendants failed to exercise ordinary care because a reasonably careful company would not continue to manufacture PFAS-based products in mass quantities and to the extent that Defendants manufactured them.

372.    There is a proximate causal connection between Defendants' breach of their duty of care and the resulting harm to the County's water supplies, water infrastructure, waters, and other public and natural resources.

373.    Defendants' negligence caused and continues to cause injury to the County.

374.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the County and the public about the human and environmental risks posed by their products, and each day on which they fail to do so constitutes a new injury to the County.

375.    The County has suffered and will continue to suffer damages in amounts to be proven at trial.

## SIXTH CAUSE OF ACTION

**ACTUAL FRAUDULENT TRANSFER RELATED TO THE CHEMOURS SPIN-OFF, PURSUANT TO MD. CODE ANN., COM. LAW III §§ 15-201, ET SEQ. AND/OR 6 DEL. C. §§ 1304(A)(1) & 1307 AND/OR SUCH OTHER APPLICABLE STATE LAW (Against Historical DuPont, The Chemours Company, New DuPont, Dow, and Corteva)**

376.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

377.    Plaintiff seeks relief pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. §§ 1304(a)(1) & 1307 and/or such other applicable state law, against Historical

DuPont, The Chemours Company, New DuPont, Dow, and Corteva.

378.    As a result of the transfer of assets and liabilities related to the Chemours Spin-off described in this Complaint, Historical DuPont limited the availability of assets to cover judgments for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of AFFF containing PFAS and/or PFAS for use in AFFF.

379.    Historical DuPont has acted with actual intent to hinder, delay, and defraud creditors of Historical DuPont, and what would become Chemours, by (i) transferring the Dividend to Historical DuPont, and (ii) causing the incurrence of obligations in connection with the Chemours Spin-off.

380.    Historical DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of creditors, such as Plaintiff, that have been damaged as a result of Historical DuPont's actions described in this Complaint.

381.    Historical DuPont manufactured, marketed, distributed, sold, and promoted AFFF containing PFAS and/or PFAS for use in AFFF despite knowing of the health and environmental risks of PFAS for decades before Chemours existed as an independent company.

382.    At the time of the Chemours Spin-off, Historical DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of AFFF containing PFAS and/or PFAS for use in AFFF, including those damages and injuries caused by the business line that Chemours would come to own.

383.    Plaintiff was a creditor of Historical DuPont and the business line that Chemours

would come to own at the time of the Chemours Spin-off.

384.    A number of the statutorily enumerated badges of fraud are present with respect to the Chemours Spin-off and evidence Defendants' fraudulent intent.

385.    The transfer of the Dividend to Historical DuPont was a transfer to an insider of Chemours, and the incurrence of obligations by Chemours to Historical DuPont, was to an insider of Chemours, Historical DuPont.  That obligation was the assumption of the Chemours Liabilities which include the Chemours Assumed Environmental Liabilities (as each are defined in the Chemours Separation Agreement), as well as the indemnification obligations under Section 6.3 of the Chemours Separation Agreement.  The transfer of these obligations to Chemours from Historical DuPont occurred at a time that Historical DuPont owned sufficient shares of Chemours, and through (i) the DuPont Board's members, (ii) Historical DuPont employees (i.e., Nigel Pond and the other DuPont Employee Board Members), and (iii) Historical DuPont agents (i.e., Historical DuPont's outside counsel), Historical DuPont controlled Chemours.  Historical DuPont was an insider of Chemours when the Chemours Spin-off was approved and consummated.

386.    The Chemours Spin-off concealed the liabilities actually assumed by Chemours. The true scope of the obligations that were to be assumed by Chemours in the Chemours Spin-off was kept from Chemours management designees (and later when they were actually functioning in those roles).  Additionally, the schedules to the Chemours Separation Agreement that correspond with the subsections of the definition of "Chemours Assumed Environmental Liabilities" were not publicly filed and the Info Statement dramatically understated the amount of those liabilities.

387.    The Chemours Spin-off occurred at a time when Historical DuPont and/or the business line that Chemours would come to own had been sued or threatened with suit related to environmental liabilities.  The business line that Chemours would come to own and Historical DuPont were subject to a substantial amount of litigation at the time that the Chemours Spin-off was approved and when it occurred, including numerous environmental suits and remediation actions.

388.    The consideration received by Chemours in respect of the Chemours Spin-off for the transfer of the Dividend to Historical DuPont, and for the incurrence of obligations by Chemours to Historical DuPont in respect of the Chemours Spin-off, was not for reasonably equivalent value.  The Chemours Spin-off was predicated upon Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for liabilities, which were valued based on accounting principles and have proven in several instances to be drastically below the actual liability amounts.

389.    Chemours was insolvent or became insolvent shortly after the Chemours Spin-off. Chemours was balance-sheet insolvent at the time of the Chemours Spin-off.  Additionally, the trading prices for Chemours's debt reflect insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off.  Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due.

390.    The existence of Houlihan's solvency opinion does not support Chemours's solvency. Houlihan used Historical DuPont's contingent liability figures that Historical DuPont engineered to massively understate the real potential maximum exposure in preparing Houlihan's solvency opinion.

391.    The Chemours Spin-off occurred shortly before or shortly after a substantial debt

was incurred.  The Chemours Spin-off occurred after the indebtedness under the Credit

Agreement and indentures was incurred.  As part of the Chemours Spin-off, Chemours incurred

significant obligations, namely the assumption of the Chemours Liabilities which include the

Chemours Assumed Environmental Liabilities (as each are defined in the Chemours Separation

Agreement), as well as the indemnification obligations under Section 6.3 of the Chemours

Separation Agreement.  Additionally, Chemours paid the Dividend to Historical DuPont.

392.    Pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. §

1307, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims in this Complaint, the

attachment or other provisional remedy (including levy) against the assets transferred to

Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Spin-

off, or the proceeds of such assets now held by New DuPont, Dow, and Corteva, or other

property of Historical DuPont, New DuPont, Dow, and Corteva, and/or to hold Historical

DuPont, The Chemours Company, New DuPont, Dow, and Corteva liable for any damages or

other remedies that may be awarded through this lawsuit.

393.    New DuPont, Dow, and Corteva are not good-faith transferees of the assets

initially transferred, including the Dividend, to Historical DuPont in the Chemours Spin-off, and

later to New DuPont and Corteva because each of Historical DuPont, New DuPont, Dow, and

Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the

fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

394.    Plaintiff further reserves such other rights and remedies that may be available to it

under Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307 and/or such other

applicable state law as may be necessary to fully compensate Plaintiff for the damages and injuries

it has suffered as alleged in this Complaint.

## SEVENTH CAUSE OF ACTION

**CONSTRUCTIVE FRAUDULENT TRANSFER RELATED TO THE CHEMOURS SPIN-OFF, PURSUANT TO MD. CODE ANN., COM. LAW III §§ 15-201, ET SEQ. AND/OR 6 DEL. C. §§ 1305(A) & 1307 AND/OR SUCH OTHER APPLICABLE STATE LAW**
**(Against Historical DuPont, The Chemours Company, New DuPont, Dow, and Corteva)**

395.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

396.    Plaintiff seeks relief pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. §§ 1305(a)(1) & 1307 and/or such other applicable state law, against Historical DuPont, The Chemours Company, New DuPont, Dow, and Corteva.

397.    Plaintiff was a creditor of Historical DuPont and Chemours at the time of the Chemours Spin-off.

398.    Chemours did not receive reasonably equivalent value in return for the assumption and/or incurrence of Chemours Spin-off related obligations, including the transfer of the Dividend.

399.    Chemours was insolvent as a result of the Chemours Spin-off.  Chemours was balance-sheet insolvent at the time of the Chemours Spin-off.  Additionally, the debt trading prices of the Notes reflect insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off.  Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due.  Lastly, the existence of Houlihan's solvency opinion does not support Chemours's solvency.

400.    Pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Spin-

off, or the proceeds of such assets now held by New DuPont, Dow, and Corteva, or other property of Historical DuPont, New DuPont, Dow, and Corteva, and/or to hold Historical DuPont, The Chemours Company, New DuPont, Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

401.    New DuPont, Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Spin-off, and later to New DuPont, Dow, and Corteva because each of Historical DuPont, New DuPont, Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

402.    Plaintiff further reserves such other rights and remedies that may be available to it under Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

### EIGHTH CAUSE OF ACTION
### CONSTRUCTIVE FRAUDULENT TRANSFER RELATED TO THE CHEMOURS SPIN-OFF, PURSUANT TO MD. CODE ANN., COM. LAW III §§ 15-201, ET SEQ. AND/OR 6 DEL. C. §§ 1304(A)(2) & 1307 AND/OR SUCH OTHER APPLICABLE STATE LAW
### (Against Historical DuPont, The Chemours Company, New DuPont, Dow, and Corteva)

403.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

404.    Plaintiff seeks relief pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law, against Historical DuPont, The Chemours Company, New DuPont, Dow, and Corteva.

405.    Chemours did not receive reasonably equivalent value in return for the assumption and/or incurrence of certain Chemours Spin-off-related obligations, including the

transfer of the Dividend.  Historical DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Historical DuPont believed or reasonably should have believed that it would incur debts beyond Chemours's ability to pay as they became due.

406.    At the time of the Chemours Spin-off, Chemours (i) was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to Chemours' business, and/or (ii) intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

407.    At the time of the Chemours Spin-off, Historical DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS, including AFFF containing PFAS and/or PFAS containing products, including for use in AFFF, including those damages and injuries caused by the business line that Chemours would come to own.

408.    At the time of the Chemours Spin-off, and at all times relevant to this Complaint, Chemours has been insolvent.

409.    Pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Spin-off, or the proceeds of such assets now held by New DuPont, Dow, and Corteva, or other property of Historical DuPont, New DuPont, Dow, and Corteva, and/or to hold Historical

73

DuPont, The Chemours Company, New DuPont, Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

410.    New DuPont, Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Spin-off, and later to New DuPont, Dow, and Corteva because each of Historical DuPont, New DuPont, Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

411.    Plaintiff further reserves such other rights and remedies that may be available to it under Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

**NINTH CAUSE OF ACTION**
**ACTUAL FRAUDULENT TRANSFER RELATED TO THE MERGER, THE SUBSEQUENT RESTRUCTURING TRANSACTIONS AND ASSETS TRANSFERS, THE DOWDUPONT SEPARATION AGREEMENT, THE DOW SPIN-OFF, AND THE CORTEVA SPIN-OFF, PURSUANT TO MD. CODE ANN., COM. LAW III §§ 15-201, ET SEQ. AND/OR 6 DEL. C. §§ 1304(A)(1) & 1307 AND/OR SUCH OTHER APPLICABLE STATE LAW**
**(Against Historical DuPont, New DuPont, Dow, and Corteva)**

412.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

413.    Plaintiff seeks relief pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. §§ 1304(a)(1) & 1307 and/or such other applicable state law against Historical DuPont, New DuPont, Dow, and Corteva.

414.    Plaintiff is and was a creditor of Historical DuPont and New DuPont at all relevant times.

415.    Through its participation in the Merger, the subsequent restructuring transactions

and assets transfers, the DowDuPont Separation, the Dow Spin-off, and the Corteva Spin-off, Historical DuPont and DowDuPont transferred valuable assets and business to New DuPont, Dow, and Corteva (the Separation Transfers).

416.     The Separation Transfers were made for the benefit of New DuPont, Dow, and Corteva.

417.     At the time that the Separation Transfers were made, DowDuPont was in a position to control, and did control, New DuPont, Dow, and Corteva.

418.     DowDuPont, Historical DuPont, New DuPont, Dow, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors of Historical DuPont and DowDuPont.

419.     Plaintiff has been harmed as a result of the Separation Transfers.

420.     DowDuPont, Historical DuPont, New DuPont, Dow, and Corteva engaged in acts in furtherance of a scheme to transfer assets out of the reach of creditors, such as Plaintiff, that have been harmed as a result of Historical DuPont's and DowDuPont's actions described in this Complaint.

421.     As a result of the transfer of assets and liabilities related to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off described in this Complaint, New DuPont, Dow, and Corteva sought to limit the availability of assets to cover judgments for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS, including AFFF containing PFAS and/or PFAS containing products, including for use in AFFF.

422.     Historical DuPont manufactured, marketed, distributed, sold, and promoted PFAS, including AFFF containing PFAS and/or PFAS containing products, including for use in

AFFF despite knowing of the health and environmental risks of PFAS for decades before Chemours existed as an independent company.

423.    At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off, Historical DuPont and/or DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding liability of Historical DuPont and DowDuPont, for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS, including AFFF containing PFAS and/or PFAS containing products, including for use in AFFF.

424.    Plaintiff was a creditor of Historical DuPont and DowDuPont at the time of the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation, the Dow Spin-off, and the Corteva Spin-off.

425.    Historical DuPont and/or DowDuPont acted without receiving reasonably equivalent value in exchange for the transfers and/or obligations comprising the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off.  Historical DuPont and/or DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

426.    At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off, and at all times relevant to this Complaint, Historical DuPont and DowDuPont had been insolvent because each of their debts were greater than the fair saleable value of each of their assets.

427.    A number of the statutorily enumerated badges of fraud are present with respect to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off, and evidence Defendants' fraudulent intent.

428.    In connection with the DowDuPont Separation, DowDuPont divided up its assets and obligations among entities it controlled, namely DowDuPont and Corteva.  Certain obligations were assumed by DowDuPont and Corteva, but not Dow, including Historical DuPont's liabilities, as well as the indemnification obligations under Article VIII of the DowDuPont Separation Agreement.  The transfer of these obligations from Historical DuPont to DowDuPont, then from DowDuPont to New DuPont, Dow, and Corteva, occurred at a time that DowDuPont controlled New DuPont, Dow, and Corteva through DowDuPont's Board's members, DowDuPont employees, and DowDuPont agents.  DowDuPont was an insider of New DuPont, Dow, and Corteva, when the DowDuPont Separation was approved and consummated.

429.    The DowDuPont Separation concealed the liabilities actually assumed by New DuPont and Corteva.  The true scope of the obligations that were to be assumed by New DuPont, Dow, and Corteva in the DowDuPont Separation Agreement were concealed.  Additionally, the schedules to the DowDuPont Separation Agreement were not publicly filed.

430.    The DowDuPont Separation occurred at a time when Historical DuPont and DowDuPont had been sued or threatened with suit related to environmental liabilities.  Historical DuPont and DowDuPont were subject to a substantial amount of litigation at the time that the DowDuPont Separation was approved and when it occurred, including numerous environmental suits and remediation actions.

431.    The consideration received by New DuPont, Dow, and Corteva in respect of the DowDuPont Separation was not reasonably equivalent to the value of the obligation incurred by New DuPont, Dow, and Corteva in the DowDuPont Separation.

432.    DowDuPont was insolvent or became insolvent shortly after the DowDuPont Separation, the Dow Spin-off, and the Corteva Spin-off.  DowDuPont was balance-sheet insolvent at the time of the DowDuPont Separation and the Corteva Spin-off.

433.    Finally, the DowDuPont Separation and the Corteva Spin-off occurred shortly before or shortly after a substantial debt was incurred.  The DowDuPont Separation and the Corteva Spin-off occurred either shortly before or shortly after DowDuPont's incurrence of $4 billion in indebtedness to Corteva.  As part of the DowDuPont Separation and the Corteva Spin-off, DowDuPont incurred significant obligations, namely the assumption of the liabilities and indemnification obligations, each under the DowDuPont Separation Agreement.

434.    Pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Corteva and Dow and the incurrence of obligations to Corteva pursuant to the Corteva Spin-off and the Dow Spin-off, respectively, or the proceeds of such assets now held by New DuPont, Dow, and Corteva, or other property of Historical DuPont, New DuPont, Dow, and Corteva, and/or to hold Historical DuPont, New DuPont, Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

435.    New DuPont, Dow, and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the subsequent restructuring transactions and asset transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, and later to New DuPont and Corteva because New DuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the subsequent

restructuring transaction and assets transfers, the DowDuPont Separation Agreement, the Dow

Spin-off, and the Corteva Spin-off Dividend; and/or (ii) the insolvency of DowDuPont.

436.    Plaintiff further reserves such other rights and remedies that may be available to

it under Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307 and/or such

other applicable state law as may be necessary to fully compensate Plaintiff for the damages and

injuries it has suffered as alleged in this Complaint.

**TENTH CAUSE OF ACTION**
**CONSTRUCTIVE FRAUDULENT TRANSFER RELATED TO THE MERGER, THE**
**SUBSEQUENT RESTRUCTURING TRANSACTIONS AND ASSETS TRANSFERS,**
**THE DOWDUPONT SEPARATION AGREEMENT, THE DOW SPIN-OFF, AND THE**
**CORTEVA SPIN-OFF, PURSUANT TO MD. CODE ANN., COM. LAW III §§ 15-201, ET**
**SEQ. AND/OR 6 DEL. C. §§ 1305(A) & 1307 AND/OR SUCH OTHER APPLICABLE**
**STATE LAW**
**(Against Historical DuPont, New DuPont, Dow, and Corteva)**

437.    Plaintiff realleges and reaffirms each and every allegation set forth in all

preceding paragraphs as if fully restated in this section.

438.    Plaintiff seeks relief pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq.

and/or 6 Del. C. §§ 1305(a) & 1307 and/or such other applicable state law against Historical

DuPont, New DuPont, Dow, and Corteva.

439.    Plaintiff was a creditor of Historical DuPont and DowDuPont at the time of the

DowDuPont Separation.

440.    New DuPont, Dow, and Corteva did not receive reasonably equivalent value in

return for the assumption and/or incurrence of DowDuPont Separation related obligations.

441.    DowDuPont was insolvent as a result of the DowDuPont Separation.

DowDuPont was balance-sheet insolvent at the time of the DowDuPont Separation.

442.    Pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. §

1307, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims in this Complaint, the

attachment or other provisional remedy (including levy) against the assets transferred to New

DuPont, Dow, and Corteva and the incurrence of obligations to Corteva in the DowDuPont

Separation, or the proceeds of such assets now held by New DuPont, Dow, and Corteva, or other

property of Historical DuPont, New DuPont, Dow, and Corteva, and/or to hold Historical

DuPont, New DuPont, Dow, and Corteva liable for any damages or other remedies that may be

awarded through this litigation.

443.    New DuPont, Dow, and Corteva are not good-faith transferees of the assets

initially transferred to Historical DuPont in the Merger, the subsequent restructuring transactions

and asset transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva

Spin-off, and later to New DuPont, Dow, and Corteva because New DuPont, Dow, and Corteva

knew or should have known of (i) the fraudulent intent underlying the Merger, the subsequent

restructuring transaction and assets transfers, the DowDuPont Separation Agreement, the Dow

Spin-off, and the Corteva Spin-off Dividend; and/or (ii) the insolvency of DowDuPont.

444.    Plaintiff further reserves such other rights and remedies that may be available to

it under Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307 and/or such

other applicable state law as may be necessary to fully compensate Plaintiff for the damages and

injuries it has suffered as alleged in this Complaint.

**ELEVENTH CAUSE OF ACTION**
**CONSTRUCTIVE FRAUDULENT TRANSFER RELATED TO THE MERGER, THE**
**SUBSEQUENT RESTRUCTURING TRANSACTIONS AND ASSETS TRANSFERS,**
**THE DOWDUPONT SEPARATION AGREEMENT, THE DOW SPIN-OFF, AND THE**
**CORTEVA SPIN-OFF, PURSUANT TO MD. CODE ANN., COM. LAW III §§ 15-201, ET**
**SEQ. AND/OR 6 DEL. C. §§ 1304(A)(2) & 1307 AND/OR SUCH OTHER APPLICABLE**
**STATE LAW**
**(Against Historical DuPont, New DuPont, Dow, and Corteva)**

445.    Plaintiff realleges and reaffirms each and every allegation set forth in all

preceding paragraphs as if fully restated in this section.

446.    Plaintiff seeks relief pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law against Historical DuPont, New DuPont, Dow, and Corteva.

447.    Historical DuPont and DowDuPont did not receive reasonably equivalent value in return for the assumption and/or incurrence of certain DowDuPont Separation related obligations.  DowDuPont acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

448.    At the time of the DowDuPont Separation, DowDuPont was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to the business or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

449.    At the time of the DowDuPont Separation, DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's and DowDuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS, including AFFF related PFAS and PFAS-containing products, including for use in AFFF.

450.    At the time of the DowDuPont Separation, and at all times relevant to this Complaint, DowDuPont has been insolvent because its debts were greater than the fair saleable value of its assets.

451.    Pursuant to Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to

DowDuPont and the incurrence of obligations to Corteva in the DowDuPont Separation, or the proceeds of such assets now held by New DuPont, Dow, and Corteva, or other property of Historical DuPont, New DuPont, Dow, and Corteva, and/or to hold Historical DuPont, New DuPont, Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

452.    New DuPont, Dow, and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, and later to New DuPont and Corteva because New DuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the subsequent restructuring transaction and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off Dividend; and/or (ii) the insolvency of DowDuPont.

453.    Plaintiff further reserves such other rights and remedies that may be available to it under Md. Code Ann., Com. Law III §§ 15-201, et seq. and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.    Damages according to proof;

2.    Punitive or exemplary damages sufficient to punish Defendants' use of fraudulent, malicious, or evil intent or actions and deter or warn others against commission of similar misconduct;

3.      Award of the past, present, and future costs to abate the ongoing public nuisance and/or to investigate, assess, analyze, monitor, remediate, and otherwise respond to the contamination, and to restore or replace environmental resources injured or impaired as a result of Defendants' conduct;

4.      Declaratory judgment and injunctive relief requiring Defendants to abate and/or pay for abatement of the ongoing public nuisance, including all future abatement techniques necessary to protect the public health and the integrity and quality of public resources in Anne Arundel County;

5.      An order voiding the fraudulent transfers of assets among Defendants The Chemours Company, Corteva, Historical DuPont, New DuPont, and Dow and recovering the property or value fraudulently transferred among these Defendants to put Plaintiff in the position in which it would have been had these fraudulent transfers not occurred;

6.      An order enjoining New DuPont, Corteva, and Dow from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Historical DuPont and/or impose a constructive trust over any proceeds from the sale of Historical DuPont assets for the benefit of Plaintiff;

7.      Litigation costs and attorneys' fees as permitted by law;

8.      Pre-judgment and post-judgment interest;

9.      Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff, Anne Arundel County, Maryland respectfully demands a trial by jury on all issues herein.

Respectfully submitted,

GREGORY J. SWAIN
County Attorney

Dated: May 31, 2023

/s/ *Hamilton Tyler*
Hamilton F. Tyler (Bar No. 9423)
Deputy County Attorney
Anne Arundel County Office of Law
2660 Riva Road, 4th Floor
Annapolis, MD 21401
Tel.: (410) 222-7888
Fax: (410) 222-7835
htyler@aacounty.org

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer (*pro hac vice* to be filed)
Kyle J. McGee (*pro hac vice* to be filed)
Viola Vetter (*pro hac vice* to be filed)
Jason H. Wilson (*pro hac vice* to be filed)
Suzanne Sangree (*pro hac vice* to be filed)
123 S. Justison Street
Wilmington, DE 19801
Tel.: (302) 622-7000
Fax: (302) 622-7100
jeisenhofer@gelaw.com
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com
ssangree@gelaw.com

**GORDON, WOLF & CARNEY CHTD.**
Richard Gordon (Bar No. 06882)
Martin Wolf (Bar No. 09425)
100 W. Pennsylvania Avenue, Suite 100
Towson, MD 21204
Tel.: (410) 825-2300
Fax: (410) 825-0066
rgordon@GWCfirm.com
mwolf@GWCfirm.com

*Attorneys for Plaintiff Anne Arundel County, Maryland*